Pauline DAVIS, Cynthia Williams, Cornelia Simmons, and Kim Rivera, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The NEW YORK CITY HOUSING AUTHORITY, Defendant.

UNITED STATES of America, Plaintiff,

v.

The NEW YORK CITY HOUSING AUTHORITY, Defendant.

Nos. 90 Civ. 628 (RWS), 92 Civ. 4873 (RWS).

United States District Court, S.D. New York.

Dec. 2, 1993.

The Legal Aid Soc., New York City (Helaine Barnett, Asst. Attorney-in-Charge, Civ. Div., Jane E. Booth, Director of Litigation, Scott A. Rosenberg, Asst. Director of Litigation, of counsel), for plaintiffs Pauline Davis, et al.

Mary Jo White, U.S. Atty., S.D.N.Y., New York City (Gabriel Gorenstein, Claude. M. Millman, Asst. U.S. Attys., Richard J. Ritter, Sp. Litigation Counsel, Valerie O'Brian, Trial Atty., of counsel), for the U.S.

Herzfeld & Rubin, P.C. (Shira A. Scheindlin, Kathleen G. Miller, of counsel), New York City Housing Authority (Alan Aviles, of counsel), New York City, for defendant New York City Housing Authority.

Giddins, Schindel & Langs, New York City (Paul M. Giddins, of counsel), for Amicus Curiae, United Jewish Organizations of Williamsburg, Inc.

## OPINION

SWEET, District Judge.

Defendant New York City Housing Authority ("NYCHA") has moved for an order clarifying the Consent Decree filed with this Court on November 16, 1992 and the Tenant Selection and Assignment Plan ("TSAP") which was an Exhibit to the Consent Decree and declaring NYCHA's plan to tenant the new Berry Street housing project (the "Plan") valid under the Consent Decree and TSAP.

The Plaintiffs in *Davis v. New York City Housing Authority* (the "*Davis* Plaintiffs") and in *United States v. New York City Housing Authority* (the "Government") (collectively, the "Plaintiffs") oppose NYCHA's motion for an order to clarify and cross-move to enforce the Consent Decree and to enjoin NYCHA's present tenanting plan for the Berry Street Project ("Berry Street") in the event NYCHA's motion to clarify is granted by the court.

For the reasons set forth below, NYCHA's motion to clarify the Consent Decree is granted and the Plan is determined to be consistent with the TSAP except as to the filling of the larger apartments as to which a preliminary injunction is granted to bar the use of duplicate requests.

### The Parties

NYCHA is the largest public housing agency in the United States, operating more than 320 projects, containing approximately 180,000 apartments which house nearly 500,-000 people. NYCHA operates these projects pursuant to an Annual Contributions Contract and other operating subsidies agreements with the Department of Housing and Urban Development ("HUD"), New York State and New York City. To be eligible for admission to public housing families must be "low-income," defined by the United States Housing Act of 1937 as receiving household income less than 80 percent of the median income for the area. *See* 42 U.S.C. §§ 1437a(a)(1), 1437a(b)(2).

The *Davis* Plaintiffs filed a class action complaint in *Davis v. New York City Housing Authority*, 90 Civ. 628, against NYCHA alleging discrimination on the basis of race, color, and national origin in the selection and assignment of public housing tenants in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq.* (the "Fair Housing Act"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.; and 42 U.S.C. §§ 1981, 1982, 1983. The Government later initiated *United States v. New York City Housing Authority*, 92 Civ. 4873, also alleging that NYCHA's policies and practices of selecting tenants for projects violated the Fair Housing Act.

### Prior Proceedings

#### I. The Two Predecessor Actions

On May 31, 1990, the *Davis* Plaintiffs filed a complaint challenging a number of NYCHA policies, including: (1) "racial balancing," which limited the number of families of color who could move into selected housing projects, Rosenberg Fairness Decl. ¶¶ 63–75, 80–83; (2) "manual scheduling," whereby NYCHA scheduled up to 10% of the applicants by hand in order to achieve "racial balancing," *id.* ¶¶ 100–102; and (3) "community preference," which restricted applicants for certain projects to families living in nearby postal zones or neighborhoods, *id.* ¶¶ 76–79.

The Government's parallel 1992 action alleged that NYCHA, in violation of the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 *et seq.*, engaged in the following discriminatory practices: (1) using codes to indicate to NYCHA personnel that only white families could be referred to certain projects; (2) misinforming applicants on the basis of their

race or national origin about the availability of apartments; (3) using race as a criteria for allocating apartments, such as replacing families of a given race or national origin with families of the same race or national origin; (4) using postal zone restrictions to ensure that families assigned to certain projects were predominately of one race; and (5) using race and national origin as a criteria in the rent-up of new projects.

The Government, the *Davis* Plaintiffs and NYCHA engaged in extensive settlement negotiations between October 1991 and June 1992. On July 1, 1992, a Consent Decree was signed which included the TSAP. The Consent Decree consolidated the Government and *Davis* Complaints, certified a plaintiff class of Black and Hispanic applicants and tenants in *Davis,* and provided certain relief with respect to the Plaintiffs.

## II. *The Fairness Hearing*

Pursuant to Fed.R.Civ.P. 23(e), a fairness hearing was held on November 6, 1992 before the Honorable Pierre N. Leval.[1] Additional written statements were received by the Court through November 11, 1992.

A summary order approving the Consent Decree was entered on November 17, 1992, followed by the written opinion and order of the Court on December 30, 1992.

## III. *The Consent Decree*

The Consent Decree provides for the following: (1) injunctive relief barring future housing discrimination on the basis of race, color or national origin, Consent Decree ¶ 4; (2) the implementation of a new TSAP which substantially revises NYCHA's tenant selection and assignment systems, and which prohibits further discrimination, Consent Decree ¶¶ 5–9, Ex. B; (3) remedial relief for 2,190 claimants[2] of NYCHA's past discrimination, Consent Decree ¶¶ 10–39; and (4) significant

record-keeping and reporting by NYCHA regarding tenant selection and assignment practices, Consent Decree ¶¶ 43–48.

The Consent Decree also requires NYCHA to "adopt and implement the TSAP ... to prevent any unlawful discrimination on the basis of race, color, or national origin." Consent Decree ¶ 5. In adopting and implementing the TSAP with "respect to existing projects and new projects to be opened in the future," NYCHA agreed that it would use "no racial quota system, or other practice, technique or device to house Applicants in particular projects, buildings, or apartments, or to otherwise limit the availability of housing, on account of race, color, or national origin." Consent Decree ¶ 7(a).

The Consent Decree states that the TSAP will be fully implemented within one year after the Court's entry of the Consent Decree and that the TSAP, to be jointly monitored by the parties, will remain in effect for five years. The Consent Decree further provides that:

> [w]ithin the one-year period, the Housing Authority shall inform plaintiffs' counsel by certified letter that the TSAP is fully implemented and the five-year period shall begin on the date of the receipt of such letter. The plaintiffs will not challenge any conduct by the Housing Authority during the five-year period that is in compliance with the TSAP on the ground that it discriminates on the basis of race, color, or national origin.

Consent Decree ¶ 6(a).

## IV. *The Tenant Selection and Assignment Plan*

The Consent Decree defines the TSAP to mean "the plan adopted by the Housing Authority, a copy of which is annexed as Exhibit B, pursuant to which it selects and assigns tenants for Conventional Public Housing."

---

**1.** A fairness hearing is conducted so that nonparties who might be effected by the decree are given the opportunity to be heard, *see In re Masters Mates & Pilots Pension Plan,* 957 F.2d 1020, 1026 (2d Cir.1992). Prior notice of the hearing was posted in all residential public housing buildings, published in three newspapers, and mailed to over 200 hundred entities and organizations.

**2.** The remedial relief consisted of awarding HUD Section 8 housing vouchers to 200 claimants; the remaining 1,990 claimants received priority placement in one of 31 public housing projects. Rosenberg Fairness Decl. ¶ 19.

Consent Decree, § I.1.m at 9. Specifically, the TSAP describes:

- how a prospective tenant can apply for an apartment, TSAP § II at 1–2;
- the priority codes assigned to apartment applicants, TSAP § III at 3–5;
- an explicit description of what information NYCHA must give to applicants to determine their eligibility for an apartment, TSAP § IV at 6–8;
- NYCHA's procedures for scheduling eligibility interviews and methods for project assignment, TSAP § V at 8–17;
- a mechanism for tenants already in the NYCHA system to transfer apartments, TSAP § VI at 18–23;
- procedures for NYCHA project managers to assign apartments, TSAP § VII at 23–28;
- programs for obtaining applicants for projects that have exhausted applications for apartments, TSAP § at 28–32;
- procedures for tenanting new projects, TSAP § IX, at 32;
- recordkeeping procedures for project managers, TSAP § X at 32; and

- monitoring procedures for NYCHA's regulation of the new system, TSAP § XI at 33.

## A. New Applications [3]

A new applicant to public housing must file a written application with NYCHA's Department of Housing Applications which in turn will date and time stamp the application. NYCHA will review and assign a priority code identifying an applicant's need for housing.[4] After priority assignment, an applicant must appear for and cooperate in an eligibility interview with the Department of Housing Applications. TSAP § V(C) at 10. Prior to the eligibility interview, in order "[t]o assure that all applicants entitled to select a project have an equal opportunity to do so," NYCHA must make available to all applicants a "project information" book and an Interviewer's Guide. TSAP § IV(B) at 7–8. The project information book describes all the projects and their respective amenities. The Interviewer's Guide, updated every two weeks by the Occupancy Control Division (the "OCD") of the Housing Applications Department,

---

3. During argument on this motion, the parties disagreed as to the meaning of the term "applicant" as used in the TSAP; whether the term means merely a *new* applicant or if the term refers to a *transfer* applicant who is a current NYCHA tenant. The Consent Decree defines an applicant as follows:

   " 'Applicant' shall mean in the case of new applicants, any person or family who submits an application, on the forms specified by the Housing Authority, seeking public housing. In the case of transfer applicants, 'Applicant' shall mean any person or family who submits a written request for a transfer, or oral request that is corroborated by a notation, form, or other document in his or her tenant file."

   Consent Decree, § I.1.c. at 5. Accordingly, it appears that the term Applicant is used to indicate both new applicants and current NYCHA tenants requesting transfers in both the Consent Decree and the TSAP.

4. Briefly, the priority codes for a new housing applicant are summarized as follows:

   *Code 0:* Emergency applicants referred by: the Human Resources Administration, HPD, or applicants about to be discharged from a city hospital facing homelessness.

   *Code 1:* Applicants who are: threatened with violence; suffer from an illness or disability aggravated by their housing conditions; in the shelter system; facing eviction (other than rent

   increases); living in homes declared uninhabitable by HPD; or living in a site about to be converted into public housing project.

   *Code 2:* Applicants that are threatened as a result of their cooperation with an on-going criminal investigation.

   *Code 3:* Applicants living in public housing in "extremely overcrowded" conditions (containing two or more distinct families) since July 1, 1990.

   *Code 4:* Applicants doubled-up and living public housing in "overcrowded" conditions (more than twice as many people as the number of bedrooms) since July 1, 1990.

   *Code 5:* Applicants living in extremely sub-standard or "extremely overcrowded" dwellings.

   *Code 6:* Applicants paying more than 50% of family income for rent or living in sub-standard housing.

   *Code 7:* Applicants living in "overcrowded" or doubled-up conditions, or with one or more persons suffering from an illness or disability in housing that constitutes a health hardship.

   Applicants in priority codes 0, 1, 5 and 6 are entitled to preferences under federal statute and regulation, *see* 24 C.F.R. § 960.211(d), .211(f), .211(h)–(i); applicants in priority codes 2, 3, 4 and 7 are entitled to NYCHA's local preference to the extent permitted by law, *see* 24 C.F.R. § 960.211(b)(2)(ii). Applicants in priority code 9 are not entitled to federal or local preferences.

lists all NYCHA projects and their anticipated vacancies. TSAP § IV(A) at 6. As a result, it is contemplated that by the time an applicant arrives at an eligibility interview, the applicant will have reviewed the Interviewer's Guide and project information book and chosen a project.

At the eligibility interview, the applicant is interviewed to determine, among other items, the apartment size needed for his or her family. At this interview, an applicant requiring a "Smaller Apartment"[5] may choose one project in one of the two boroughs listed on the application and the interviewer records the project selection. If the applicant provides all the required information, and is determined to be eligible for public housing, the application will then be "certified" to the selected project. TSAP § V(C) at 10–13.

Under the TSAP, applicants for "Larger Apartments" may not select a particular project. "Because the turnover in 'Larger Apartments' is very low," TSAP § V(D)(2) at 15, such applicants can only designate one of the two boroughs listed on the application. "Larger Apartment" applications are certified to OCD which will match the applicant to the borough listed as his or her turn comes up by priority ranking and date of certification. TSAP § V(D)(2) at 15–16.

### B. *Transfer Applications*

Under the TSAP, current NYCHA tenants may apply to transfer apartments within public housing, provided such a transferee tenant submits a written request to the manager of the project in which he or she lives. For a transfer request within the project (an "intra-project" request), the Project Manager assigns the request a priority code and places it on the project waiting list. For a transfer request to another project (an "inter-project" request), the project manager must approve the transfer request, assign a priority code and send it to the District Director. If the District Director approves of the request, he or she shall transmit the request to the Deputy Director of Management for that district for final approval. TSAP § VI(A) at 18.

Transfer requests are assigned the following priority codes:

*Code 0:* Tenants who are displaced due to project renovation or because the project needs their particular apartment. Tenants living in an underoccupied apartment.

*Code 1:* Tenants who are victims of domestic violence, violence at their project or are suffering a rent hardship (applies to projects with special income restrictions) may *only* choose the borough to which they would like to transfer request assigned.

Tenants asking to return to the original project that they were displaced from because of project renovation.

Tenants related to a family member who dies in the apartment at which the tenant resides may chose an intra-project transfer.

*Code 5:* Tenants who are "extremely overcrowded" or in long-term friction with neighbors. These tenants must chose an intra-project transfer, unless it will take more than two years for an apartment to become available or the friction is irresolvable. In such cases, transferees needing "Larger Apartments" must go on the borough list (as certified through OCD), transferees needing Smaller Apartments may choose any project from the Interviewer's Guide (and certified to the project).

Tenants with special medical, health or day care needs. For example, in the case of a tenant needing care from a specified facility not available reasonably close to their project may be transferred to a project that NYCHA deems is near the medical facility. If the needed medical care is not limited to a specific facility, transferees needing Larger Apartments must go to the borough list (such requests will be certified to OCD which will assign the transferees to a project near an appropriate facility) and transferee to Smaller Apartment may choose a project near an appropriate facility . . .

---

5. A "Smaller Apartment" is defined to have two bedrooms or less. A "Larger Apartment" is defined to have three bedrooms or more. TSAP §§ V(C) at 11, V(D)(2) at 15.

*Code 6:* Tenants who are "overcrowded," defined to mean living in an apartment with more than twice as many people as the number of bedrooms, *see* TSAP § III(B) at 4. Such transferees must choose their current project. However, if they remain on a wait list for more than two years at their project, transferees requiring a Larger Apartment may only chose a borough (and be certified to OCD); transferees requiring a Smaller Apartment may choose any project anticipating vacancies from the users guide.

Tenants required to travel more than 90 minutes due to change in work location or elderly who wish to move to an from a general population project to an elderly designated project.

At each of the projects, a waiting list is kept by apartment size. The waiting list is defined "as all of the applications and transfer requests awaiting rentals at each project." TSAP § VII(A) at 23. The waiting list is composed of applications and transfer requests that are "certified" to the project. If a certified applicant rejects an offer of an apartment more than two times, that applicant's request is deemed "dead."

When a vacancy occurs, the project manager notifies the Command Center.[6] If the Command Center has an applicant for the apartment, the project manager will assign the apartment to that applicant. If there is no applicant at the Command Center, the Command Center "releases" the vacancy to the project manager who will assign the apartment, in accordance with the TSAP-defined income guidelines, to the applicant with the highest priority and the oldest certification date.

For "Smaller Apartment" vacancies released by the Command Center, the project manager may offer the vacancies to applicants off the project waiting list. For "Larger Apartment" vacancies released by the Command Center, project managers will contact OCD and compare the intra-project transfer requests on the project waiting list with the borough-wide applications list pending at OCD. "The [Larger Apartment] shall be rented to the appropriate applicant, using the criteria of apartment size, 'Income Tier,' priority and date of certification, in that order." TSAP § VII(B) at 27.

### C. *Borrowing Applications from a Neighboring Project*

The TSAP allows a project manager to "borrow" applications from a neighboring project, with the District Supervisor's permission, if there are no applications for "Smaller Apartments" or if there is a vacancy that all the certified applicants for that apartment size have refused. TSAP § VII(A) at 28–29. However, in the event the "borrowing project's tenant body is more than 30% white, OCD shall not select a project whose tenant body is also more than 30% white" from which to borrow applicants. TSAP § VII(A) at 29.

Pursuant to OCD's approval, the borrowing manager will request a list of all the applicants certified to the neighboring project who qualify for the appropriate vacant apartment size and mail a "canvass" letter to applicants on the list informing them that they may elect to have their applications transferred to the borrowing project. The letter "shall explain that applicants may have their applications remain at the original project without penalty." TSAP § VII(A) at 29.

### D. *Applications Outreach*

In the event a project fails to attract sufficient applicants through Project Outreach, or cannot use Project Outreach because none of the neighboring projects have enough applicants on their own waiting lists, the TSAP provides that the District Supervisor shall request that such an under-subscribed project be included in the Applications Outreach Plan. The Applications Outreach Plan may also be used if the Department of Housing Applications determines that borrowing will not solve the project's need for applications or if in the next six months a project is likely to generate several unfilled vacancies.

---

**6.** The Command Center controls the applications of the extremely high priority applicants, for example, the Code 0 and Code 1 priority transfer applicants. TSAP § VI(B) at 19–20.

The Applications Outreach Plan permits the Department of Housing Applications. to poll its computer data base to locate applicants of the appropriate family size (and income levels for projects with income restrictions) from the under-subscribed project's borough list. Applicants identified by this method shall be canvassed by NYCHA to find out if they wish to be interviewed for the under-subscribed project. Applicants responding to the canvass letter agreeing to waive the right to select projects not included in the Applicants Outreach Plan shall be scheduled for an eligibility interview in the order in which their responses are received. Upon eligibility determination, such applicants will be certified to the outreach project(s) and will be processed with the other applications on the project waiting list. Applicants refusing certification to the outreach project(s) will have their applications returned the computer data base to await their interview under the regular new applicants procedure.

### E. *Tenanting New Projects*

The three sentences constituting the entirety of the TSAP's provision for tenanting new projects are:

IX. *Tenanting New Projects*

Projects under construction shall be designated on the Interviewer's Guide as anticipating vacancies approximately six months prior to their scheduled opening date. In addition, prior to opening, new projects may be included in the Applications Outreach Plan set forth in Section VIII B above. After opening, projects shall be tenanted in accordance with the provisions of this Plan.

No other section of the TSAP identifies itself as relating to the tenanting of new projects.

### V. *The Pending Motion*

On October 8, 1993, NYCHA moved this court for an order clarifying the Consent Decree filed with this Court on November 17, 1992. On October 19, 1993, the *Davis* Plaintiffs cross-moved this court to enforce the Consent Decree and the Government moved to enjoin NYCHA from proceeding with its plan for tenanting the Berry Street Project as set forth in its October 8, 1993 papers. On October 29, 1993 the United Jewish Organizations of Williamsburg, Inc., moved this court for leave to appear as amicus curiae. In anticipation of the ascension of Judge Leval to the Court of Appeals, this consolidated action and the pending motions were transferred to this Court on November 16, 1993, pursuant to Local Rule 13.

Oral argument on the motions was heard by the court on November 17, 1993. At that time, the court granted leave to United Jewish Organizations of Williamsburg to submit their amicus curiae brief.

### *Findings of Fact*

Since the entry of the Consent Decree in November, 1992, NYCHA has built or is in the process of building four new projects: Berry Street, Sutter Avenue, Howard Park, and West Side Development Project. NYCHA's plans for tenanting one of these projects, Berry Street, has created the storm which has resulted in these proceedings. Berry Street, a newly constructed 150–unit low-rise public housing project located in the Williamsburg area of Brooklyn, is ready for imminent occupancy, and NYCHA intends to tenant it with both new applicants and transfer applicants from a unified waiting list arranged by priority code. Sutter Avenue project will consist of approximately 100 units and is expected to open in March 1994. It was listed in the Interviewer's Guide on October 12, 1993. Howard Park, a project with approximately 156 apartments, was listed in the Interviewer's Guide on November 24, 1992 and was opened in May 1993. West Side Development Project is restricted to the elderly. Because of an unexpected acceleration in its completion date, Berry Street was placed in the Interviewer's Guide on July 6, 1993, only four months prior to anticipated rent up.

On July 13, 1993, NYCHA issued a directive, General Memorandum 3468, to all its project managers to survey those applicants and transfer applicants who had been on their projects' waiting lists for two or more years. The memorandum advised project managers that every prospective tenant or transfer tenant needing a "Smaller Apartment" may request reassignment to the

Waiting List of a project then appearing in the Interviewer's Guide *or* chose to remain on their own projects' waiting lists. Transfer tenants waiting on a project list for "Larger Apartments" were to be told that they could opt to be placed on a borough-wide waiting list *and* at the same time remain on their original projects' waiting list.

The NYCHA also included certain "deemed" transfer requests that had been on the intra-project waiting lists for more than two years. According to the 1980 Management Manual, project managers are to prepare overcrowded apartment transfer cards as soon as it becomes known that an apartment is overcrowded or underoccupied. The Management Manual also requires a tenant requesting a transfer to prepare and sign a tenant request for transfer form. Although transfer requests are supposed to be in writing, NYCHA project managers commonly prepared an intra-project transfer file card, as a result of an annual review of the tenants in the project, or oral or written request by a tenant. NYCHA contends that this practice is consistent with the definitions section of the Consent Decree which defines a transfer applicant to "mean any person or family who submits a written request for a transfer, or oral request that is corroborated by a notation, form, or other document in his or her tenant file." Consent Decree at § I, ¶ 1(c).

Pursuant to this canvassing procedure, nearly 200 project managers reviewed their project waiting lists to determine whether new and transfer applicants on those lists for longer than two years wished to select a different project (for "Smaller Apartments") or be placed on a borough-wide waiting list (for "Larger Apartments"). All told, 9,417 families (8,119 tenant transfer applicant and 1,298 new applicants) who had been waiting on project waiting lists for more than two years were canvassed.[7] The racial composition of the 8,119 eligible tenant families awaiting transfer for more than two years was 51.5% Black, 34.9% Hispanic and 12.5% White. In contrast, currently only 6.5% of new applicants on the Housing Application Tracking System ("HATS") are White.

Of the 9,417 families, 8,136 required "Smaller Apartments" and 1,281 required "Larger Apartments." Of the total canvass, approximately 1,100 families responded positively, 3,450 requested to remain on their current waiting and 4,800 did not respond. Of the 1,100 families who responded positively 47% are White. Of those responding to the canvass seeking three and four-bedroom apartments, 40% are White. Of the 1,281 requiring "Larger Apartments," 446 (35%) requested to be placed on the borough-wide list. Of these 446, 45% are Black, 32% are Hispanic and 23% are White. Of the 611 "Larger Apartment" families waiting on project waiting lists in Brooklyn, 42% are Black, 42% are White and 16% are Hispanic. Of the 168 "Larger Apartment" families requesting to be placed on the Brooklyn borough-wide waiting list, 47% are White, 45% are Black and 8% are Hispanic.

According to NYCHA's plans, the likely racial composition of Berry Street is as follows:

| Apartment Size | Number of Apartments | Number of Whites | Number of Black/Latino |
|---|---|---|---|
| 1–bedroom | 22[8] | 0 | 22 |
| 2–bedrooms | 76(61)[9] | 5 | 56 |

7. Of the intra-project transfer requests 79% have been waiting for an apartment for more than three years and 63% have been waiting for an apartment for more than four years.

8. All 22 slots will be filled with "relocatees" displaced by project renovation at the neighboring Williamsburg Houses Project.

9. There are actually 76 two-bedroom apartments. However, NYCHA only has 61 slots filled as follows: the first 11 slots will be assigned to Code 0 transfers; the next 23 slots will be assigned to the Williamsburg Houses relocatees, one of whom is White; the next 2 slots will be assigned to Code 1 transfers, one of whom is White; the next 3 slots will be assigned to Code 5 transfers, all of whom are people of color; the next 21 will be assigned to Code 6 transfers, 18 of whom are people of color, 3 of whom are White. Thus, of the 61 2–bedroom apartments that can be immediately tenanted, 5 will be White. For the remaining 15 two-bedroom

| Apartment Size | Number of Apartments | Number of Whites | Number of Black/Latino |
|---|---|---|---|
| 3–bedrooms | 46[10] | 12 | 34 |
| 4–bedrooms | 6[11] | 6 | 0 |
| | 150 (135) | 26 | 124 |

The incipient availability of the Berry Street apartments was well known in the neighborhood, and members of the Williamsburg Hasidic community sought and obtained meetings with the NYCHA personnel, including its chairwoman, commencing in mid-spring 1993 to obtain information about the procedures to be used in the renting of the Project. After these meetings, a member of the City Council and of Congress also expressed interest and concern on the subject. A flyer in Yiddish with the heading "Legal Defense Fund of Williamsburg" was circulated over the summer to Williamsburg tenants advising those seeking Larger Apartments to fill out the appropriate forms and to submit them to the Legal Defense Fund to be checked for accuracy.

Late in the summer, meetings were also held between representatives of the NYCHA and the Plaintiffs as well as counsel in another public housing case, Brooklyn Legal Services Corporation A, which represented plaintiffs in *Williamsburg Fair Housing Committee v. New York City Housing Authority*, 76 Civ. 2125. That case had resulted in the entry of a consent decree between the parties in 1978 and, after contempt proceedings, a second consent decree in 1991. By September the differences between the parties which gave rise to these proceedings had emerged.

As a result of the news that NYCHA planned to use a unified waiting list of new and transfer applicants, on October 1 through 2, 1993, for 18 hours, 200 predominately Latino protestors occupied the Berry Street project. N.Y. Times, Oct. 3, 1993, § 1, at 35. To end the demonstration, Sally B. Hernandez–Pinero, Chairwoman of the Housing Authority said "I told them 'you can sit with me during the process and assess by yourselves that this is a fair process,' I can guarantee them that this will be a fair process." *Id.; see also*, Aviles Affirm. ¶ 13.

On October 5 and 6, 1993, NYCHA received notice from the *Davis* counsel and the Government respectively that, pursuant to the emergency violation provisions of paragraph 58 of the Consent Decree, they would move this court to hold NYCHA in contempt of the Consent Decree if it continued its current method of tenanting of Berry Street. Because of these proceedings and their possible outcome, the certification of the waiting list for Berry Street has been deferred.

### The Issues

As a consequence of the prior proceedings and the facts found above, five issues are presented for resolution:

- Was a unified list required for tenanting new projects which includes tenants seeking transfers?
- Was NYCHA permitted to survey its tenant population in connection with preparing a unified list?
- Was the proper population surveyed?
- Is the tenant selection for the Larger Apartments in accordance with the TSAP?

apartments, there are no remaining relocatees, certified applicants or transfer applicants. NYCHA states that it will tenant these 15 apartments from the new applicant pool for "Smaller Apartments" in Brooklyn, which is 13% white. Accordingly, NYCHA estimates that 2 of the remaining 15 apartments will go to White families.

10. The 46 three-bedroom apartment will be filled as follows: the first 3 slots will be assigned to Code 0 transfers, all of whom are of color; the next 2 slots will be assigned to "relocatees" (also Code 0), all of whom are people of color; the next slot will be assigned to a Code 3 transfer, who is a person of color; the next 17 slots will be assigned to the 17 Code 5 transfers, 8 of whom are White; the remaining 25 slots will be assigned to the next 25 Code 6 transfers, 4 of whom are White.

11. All six are transfer applicants and are White.

• Has NYCHA complied with the injunctive provisions of the TSAP with respect to the procedures for renting the "Larger Apartments"?

For the reasons set forth below, the first four issues are resolved in the affirmative, the later issue in the negative.

### Conclusions of Law

#### I. The Terms of the Consent Decree and the TSAP Control the Disposition

As a general matter, consent decrees are entered into because the parties determine that the consent decree provides a solution preferable to litigation. The courts often look favorably on consent decrees which are deemed to benefit society by reducing litigation and enforcement costs since parties are more likely to comply with voluntary agreements. *See* Note, *The Modification of Consent Decrees in Institutional Reform Litigation,* 99 Harv.L.Rev. 1020, 1026–27 (1986). Nevertheless, the benefits conferred by a consent decree are diminished in cases, such as here, in which the consent decree does not yield a case precedent to guide future conflicts. *See* Owen M. Fiss, *Against Settlement,* 93 Yale L.J. 1073, 1082–87 (1984).

In *United States v. Armour & Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) ("*Armour*"), the Supreme Court delineated the general contextual considerations for courts determining the obligations of parties to a consent decree:

Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus, the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and

skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

*Id.* at 681–82, 91 S.Ct. at 1757. In accordance with *Armour,* consent decrees are regularly interpreted by their plain meaning. *Suarez v. Ward,* 896 F.2d 28, 31 (2d Cir. 1990); *United States v. Olin Ski Co.,* 503 F.Supp. 141, 144 (S.D.N.Y.1980).

Notwithstanding *Armour*'s "four corners" rule, the Supreme Court has held that consent decrees must not be subject to mechanical interpretation, but rather that consent decrees ought to be construed under the principles of contract interpretation:

Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction in proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule of *Armour.*

*United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975) ("*ITT Continental Baking Co.*") (footnote omitted). Following the rule of *ITT Continental Baking Co.,* courts have found it appropriate for a district court "to consider the history of the decree's negotiation" in interpreting a provision of the consent decree. *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.,* 869 F.2d 34, 38 (2d Cir.1989).

In this vein, the Second Circuit has held that "when the language of a consent decree provision is not clear on its face, a court of equity may, in construing the provision, consider the purpose of the provision in the overall context of the judgment at the time the judgment was entered." *United States v. American Cyanamid Co.,* 719 F.2d 558, 564 (2d Cir.1983), *cert. denied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984). " 'The authority of a federal court to adopt a consent decree comes only from the statute

which the decree is intended to enforce. If there is a 'purpose' to be effectuated, it is the purpose of the statute pursuant to which the government seeks relief. Within that framework, the parties strike their bargain.'" *Id.* at 564 (quoting *United States v. Motor Vehicle Manufacturers Association of the United States, Inc.*, 643 F.2d 644, 650 (9th Cir.1981) (citations omitted)). *But see S.E.C. v. Levine*, 881 F.2d 1165, 1178 (2d Cir.1989) (holding consent judgments "'should be construed basically as contracts, without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation.'" quoting *ITT Continental Baking Co.*, 420 U.S. at 236–37, 95 S.Ct. at 934–35).

The Supreme Court has held that a court may use its equitable powers to modify an institutional reform consent decree after a showing of "either a significant change in factual conditions or in law" warrants a revision of the consent decree. *Rufo v. Inmates of Suffolk County Jail*, — U.S. —, —, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992) ("*Rufo*") (rejecting the "grievous wrong" standard of *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932)). As a result, the line demarcating the boundary between a clarification and modification of a consent decree is often blurred. "Consent decrees are subject to continuing supervision and enforcement by the court . . . [which] 'has an affirmative duty to protect the integrity of its decree ... where the performance of one party threatens to frustrate the purpose of the decree.'" *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985) (citing *Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 557 (6th Cir.1982), *rev'd* on other grounds sub nom., *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 576, 104 S.Ct. 2576, 2586, 81 L.Ed.2d 483 (1984)).

Recently, the Second Circuit emphasized the limited discretion afforded to a district court in clarifying consent decrees, *see Crumpton v. Bridgeport Educ. Ass'n*, 993 F.2d 1023 (2d Cir.1993) ("*Crumpton*"). In *Crumpton*, the court held that the district court's clarification of an affirmative action hiring order constituted an impermissible modification of the Consent Decree, which requires a *Rufo* inquiry. *Id.* at 1029 (applying *Rufo v. Inmates of Suffolk County Jail*, — U.S. —, —, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992) to find the district court's clarification constituted an impermissible modification of the consent decree). *But see United States v. Yonkers Bd. of Educ.*, 927 F.2d 85 (2d Cir.) (holding that district courts are owed deference in their choice of remedy in racial discrimination cases, citing *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1236 (2d Cir.1987)), *cert. denied*, — U.S. —, 112 S.Ct. 70, 116 L.Ed.2d 45 (1991).

■ In sum, absent litigation on the merits, courts are typically limited in their ability to afford relief beyond the express provisions of a consent decree, *see Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 573–75, 104 S.Ct. 2576, 2585–86, 81 L.Ed.2d 483 (1984), since "'it is no simple matter for a court to surmise' what contracting parties would have done had they foreseen a situation." Comment, *The Supreme Court, 1991 Term; Leading Cases*, 106 Harv.L.Rev. 163, 295 n. 43 (1992).[12] Although a district court

---

12. This Comment urges the adoption of hypothetical contract standard, a model endorsed by many commentators in the contract modification literature, in assessing the merits of modifying a consent decree. The hypothetical contract standard argues that if parties did not expressly address the risk of changed circumstances in the contract language, then a court must pose two queries: first, if the parties had explicitly considered the possibility of the changed circumstances, would they have agreed to the decree's modification? and second, if the parties would have agreed to such circumstances, what alternatives would they have agreed to adopt? *See* Comment, *The Supreme Court, 1991 Term; Leading Cases*, 106 Harv.L.Rev. 163, 293–94 (1992).

Since the parties here are not arguing changed circumstances, but merely differing interpretations of the language and intent of the Consent Decree, it is premature to reach the question of whether to apply the modification standard recently set down by the Supreme Court, *Rufo v. Inmates of Suffolk County Jail*, — U.S. —, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), or the alternative hypothetical contract standard urged by various legal commentators, *see, e.g.*, Charles Fried, *Contract as Promise* 73 (1981); David Charny, *Hypothetical Bargains: The Normative Structure of Contract Interpretation*, 89 Mich. L.Rev. 1815 (1991).

"is not merely a 'rubber stamp'...." "[o]nce judgment consented to has been entered as the judgment of the court, the court is by and large required to honor the terms agreed to by the defendant." *S.E.C. v. Levine*, 881 F.2d 1165, 1181 (2d Cir.1989).

## II. *Transfers Are Properly Included in Tenanting New NYCHA Projects*

■ The Consent Decree in this case is silent as to the method for tenanting of new projects, other than providing in the injunctive provisions that NYCHA may not employ racial quotas, geographic restrictions, or preferences on the basis of race, color or national origin as it implements the TSAP in present and future projects. Consent Decree § 7, at 15–16. The three sentences on the subject in the TSAP, quoted above, do not provide for a new and different process for filling vacancies in new projects than that used in filling vacancies in existing projects but rather implement the unified list process by reference to details unique to new projects.

The first sentence states: "Projects under construction shall be designated on the Interviewer's Guide as anticipating vacancies approximately six months prior to their scheduled opening date." However, as the Interviewer's Guide only lists three apartment sizes—no bedrooms, one-bedroom and two-bedrooms—it would appear that this Guide is geared towards individuals requiring "Smaller Apartments" regardless of their status as new or transfer applicants. Further, there is nothing in the sentence which limits the tenanting process to only *new* tenants. The transfer section specifically states four times in three pages that applicants for Smaller Apartments "may choose any project designated as anticipating vacancies on the Interviewer's Guide." TSAP at 20–22. The supplying of the Interviewer's Guide to applicants is not required under the sections of the TSAP for Emergency Applicants, Applicants for Larger Apartments and Disabled Applicants, *see* TSAP at 14–17, all presumably new applicants who would be included in the tenanting of new projects.

Accordingly, since both new applicants and transfer applicants have access to the Interviewer's Guide, the first sentence indicates simply that both new and transfer applicants, at least for Smaller Apartments, are to be fully informed, with reasonable advance notice, of the availability of new housing projects. *See* TSAP at 6, 11, 19–23.

The second sentence states: "In addition, prior to opening, new projects may be included in the Applications Outreach Plan set forth in Section VIII B above." This sentence is permissive. It allows NYCHA to notify potential applicants of new projects in accordance with the TSAP's outreach scheme. The third sentence [following in time sequence] states: "After opening, projects shall be tenanted in accordance with the provisions of this Plan." The modifying construction—"after opening"—cannot be read to establish that only the Interviewer's Guide and the Application Outreach methods may be used during rent up for the reasons already stated.[13]

The "after opening" clause merely modifies the proceeding sentence to indicate that only the Application Outreach method—not the Project Outreach method (borrowing tenants from neighboring projects)—may be used during rent up. In short, the "after opening" language merely means that both outreach programs may be used after the opening of a project.

Not one of Section IX's three sentences explicitly describes whether transfer applicants may be used or not in tenanting new projects.[14] However, the plain language of Section IX simply does not prohibit the use of transfer tenants in populating new projects, nor does it contemplate a departure

---

13. The Government cites *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985), in support of its proposition that to read this section under NYCHA's interpretation would make the third sentence meaningless, contrary to the notion that a contract generally should be construed to give effect to all of its terms.

14. The *Davis* Plaintiffs cite several drafts of this clause from the negotiations in support of their interpretation banning the use of transfer applicants. However, none of the proffered drafts shed light on the substantive meaning of this section.

from the unified waiting list concept. In the absence any of strong interpretative guidance otherwise,[15] this court may not read in prohibitions where none simply exist.

Further, there is no factual or intuitive basis upon which to treat vacancies in new projects differently from those in existing projects. Of course, the numbers of vacancies differ and to the extent that any prior practices skewed the makeup of tenant populations, inclusion of transfer applicants could to a degree perpetrate such prior practices. However, if the parties were in agreement that only new applicants were to tenant new projects as an exception to the practice relating to vacancies of existing projects, it would have been easy to so provide.

Therefore, use of transfer applicants in tenanting new projects is not prohibited under Section IX of the TSAP and NYCHA's motion for clarification is granted.

### III. *Annual Canvasses of Applicants and Tenants are Not Prohibited Under the TSAP*

■ The TSAP provides for canvassing in the following three circumstances. First, in an apparent effort to clean up project-based waiting lists, the Project Managers are required to review their Projects' waiting lists annually by canvassing all applicants and inter-project transfers, but excluding intra-project transfers. TSAP § VII(A) at 25. Second, under the TSAP's Project Outreach section, a Project Manager is permitted to canvass a neighboring project's applications waiting list, provided that both the borrowing

and neighboring projects' tenant bodies are not more than 30% White. TSAP § VIII(A) at 28–30. Third, under the Applications Outreach section of the TSAP, if a project has failed to attract enough applicants through Project Outreach, the Department of Applications will poll the computer data base and subsequently canvass the appropriate applicants on that borough's waiting list.

Although the July 13, 1993 canvass, initiated pursuant to General Memorandum 3468, does not clearly fall into any of these three TSAP provided canvass methods, it is not inconsistent with the three methods outlined above. According to NYCHA, the early completion of Berry Street forced them to expedite the implementation of a unified list so that the project could be rented-up from a unified list consistent with the TSAP and, as a result, the July 13 canvass was necessary in order to prepare such a unified waiting list. Graziano Aff. at ¶ 3.[16]

According to the Plaintiffs, NYCHA's canvassing procedure described in General Memorandum 3468 is not authorized in connection with the permitted for the rent-up of new projects and, in addition, is discriminatory.[17] The Plaintiffs have not set forth a viable method for creating a unified list for tenanting new projects other than simply tenanting the projects with new applicants only—an option not contemplated by the plain language of the TSAP. In order to develop a unified list for the Berry Street project it seems necessary to use some form of canvass to locate prospective tenants, including both new applicants and transfers.

---

**15.** Another interpretative skirmish involves paragraphs 43(e) and 43(g) of the Consent Decree's monitoring section. Paragraph 43(e) provides monitoring and record keeping for projects during rent-ups and includes transfer applicants. Paragraph 43(g) also describes monitoring of new project rent-up:

> For the rent-up of new projects: the name and location of the project, the date the project was first placed on the Interviewer's Guide and/or Applications Outreach Program, and the method by which applicants were obtained for the project (normal HATS waiting list and/or the applications outreach programs, as described in the TSAP).

Consent Decree ¶ 43(g). The parenthetical clause referring to HATS (Housing Applicant Tracking System) without reference to TDS (Ten-

ant Data System) is not sufficient to require that only new applicants be used to tenant new projects in view of the specific language of 43(e) which provides that transfers are to be recorded during rent-up.

**16.** At oral argument, NYCHA stated that there is simply no other way to create a unified list for the projects and the borough-wide lists. Hearing Trans. at 59.

**17.** Of the 107 larger families choosing to go on the borough-wide list as of the time of the submission of this motion, 49 were White (45.8%); 45 of which were living in three Williamsburg Projects—Williams Plaza, Independence and Taylor–Wythe. Rosenberg Decl. at ¶ 17.

The Government also has questioned the actual canvass methodology articulated by General Memorandum 3468, and in response to these methodological concerns, at oral argument, NYCHA stated that it planned in the future to conduct an annual survey of all those waiting on the transfer lists for more than two years. Hearing Trans. at 23. NYCHA further attested to the uniformity of the canvass method:

> all those who were on project waiting lists for more than two years ... [t]hey were predominantly tenants but a thousand of them were applicants who had been waiting for more than two years. So it was a survey of all those waiting for more than two years on the project waiting lists.

Hearing Trans. at 7.

There is nothing in this record to indicate that the transfer applicants surveyed did not include as well tenants who: (1) are suffering a rent hardship; (2) are medically needy; (3) needing child care within a reasonable distance; (4) requiring specially-equipped or accessible apartments; and (5) have changed circumstances requiring them to travel more than 90 minutes to work. In answer to the Court's specific query as to whether the survey also canvassed transfer applicants for other codes, for example the medically needy and other special status transfer requests, NYCHA explicitly stated that: "The answer is we did ... Let me explain why we say we did. Everybody waiting on the waiting list for more than two years was surveyed." Hearing Trans. at 7. Accordingly, the transcript reads that NYCHA canvassed people who are medically needy and other special status transfer requests. If they were not surveyed, the Court presumes that the special status transfer requests—Code 0 and Code 1—who have higher priority than Code 5 transfer requests (e.g. "Extremely Overcrowded" families) have been certified to the Command Center list and will receive a higher priority than the canvass respondents.

Therefore, absent a citation to a specific provision in the TSAP which prohibits NYCHA from using a properly conducted canvass to create a unified list for a project and for updating its borough-wide lists, the TSAP does not prohibit NYCHA's use of a canvass to create such lists.

## IV. Transfer Applicants May be "Deemed"

Under the TSAP, NYCHA tenants are permitted to apply to transfer from one apartment or project to another. All transfer applicants "*must* submit a written request to the manager of the project at which they reside" and, in turn, NYCHA notifies the transfer applicant in writing of the request's outcome. TSAP § VI at 18 (emphasis added).

It is conceded that both the TSAP and even the old 1980 NYCHA Manual for Project Managers require transfer requests to be in writing. It is also not disputed that during the period prior to the TSAP a number of project managers commonly prepared an intra-project transfer file card whenever they learned that a family was overcrowded, that their apartment was underoccupied at its tenants' annual reviews, or upon the receipt of an oral request and that some managers did not retain an applicant's written request. These lists prepared by Project Managers after written requests were received, as set forth above, satisfy the requirements of the TSAP and constitute the basis of the unified waiting list.[18] It would be inequitable to void such requests, since substantial percentages of the intra-project transfer applicants have been waiting for apartments for more than three or four years.

These lists were used in executing General Memorandum 3468 and therefore resulted in the survey and written request form being sent to some existing tenants who had not previously submitted written requests, the number thus "deemed" by NYCHA to have filed requests is unknown. The "deeming" procedure therefore may only be used in interpreting the results of the July 13 canvass, so that a the unified and borough-wide

---

18. *See* Consent Decree § I.1(c) at 6 (" 'Applicant' shall mean any person or family who submits a written request for a transfer, or oral request that is corroborated by a notation, form, or other document in his or her tenant file.")

lists necessary to implement the TSAP may be prepared. In the future, all transfers requests must be in writing pursuant to the plain language of the TSAP. *See* TSAP § VI at 18.

One problem remains with respect to the "deemed" transfer application: the date of the original application is a factor establishing priority. TSAP § VII at 27 ("The apartment shall be rented to the appropriate applicant, using the criteria of apartment size, "Income Tier," priority and date of certification, in that order."); *see also, id.* at 24. If that date is not established by the computer record of the list maintained by the project manager, only the date on the application submitted in accordance with the survey would be appropriate in accordance with the scheme envisioned by the Consent Decree and the TSAP.

Since written requests are now the basis of certification, and fairness and equity require "deeming" to determine the affected population to be surveyed and since there is no evidence which has established that the "deeming" procedure was not uniform, "deeming" procedure used during the July 13 canvass did not violate the TSAP.

### V. *NYCHA May Not Allow Transfer Applicants for "Larger Apartments" Two Choices*

■ The transfer section of the TSAP permits NYCHA tenants to transfer from one apartment or project to another, provided they submit a written request to their project manager. Good cause transferees in priority Codes 0 and 1 are certified to the Command Center for assignment. Transferees seeking "Larger Apartments" in priority Codes 5 and 6 (e.g. transferees who are "extremely overcrowded" or "overcrowded") are required to choose their current project, unless their project does not have an apartment the correct size or it is estimated that it will take more than two years for an apartment in their project to become available. In such cases, these transferees are allowed to choose

"only" the borough in which they wish to live and, consequently, their requests are certified to OCD. *See, e.g.,* TSAP § VI(B) at 19–23. If the TSAP had contemplated such transferees to be on both lists at the same time, it would have clearly stated so under these good cause priority codes. Instead, the TSAP uses the limiting term "only" thereby implying that a "Larger Apartment" transferee must choose between being on their intra-project list or the borough-wide transfer list for larger apartments.[19]

The TSAP further provides that applicants and transferee must be certified to only one waiting list at a time. "Once an applicant (including a transferee) has been certified to a project, the applicant may not request another transfer or change his or her project choice, unless the applicant has been on a project's 'Waiting List' for more than two years without having been offer an apartment, or demonstrates 'Changed Circumstances' requiring a change in location." TSAP § VII(A) at 24. In the event an applicant or transferee has been waiting two or more years, the TSAP allows an applicant or transferees to petition their project manager. In that event, the "project manager shall send the application to OCD which shall arrange a new eligibility interview and/or a new project choice, as required." TSAP § VII(A) at 25. This sentence indicates that the procedure for transferees that have been waiting for more than two year is to have their application taken off of the intra-project waiting list and sent for recertification to a new project through OCD.

It is illuminating to note that the provision entitled "Applicants for 'Larger Apartment'" appears in the Section IV(D) which is called "Applicants Who May Not Select Projects." In that section the TSAP states:

> The applications of such [Larger Apartment] applicants who are eligible for public housing shall be certified to OCD which will match each applicant to an actual vacancy in the borough selected at the applicant's eligibility interview without regard

---

**19.** Buttressing this interpretation is the fact that the TSAP provides that Code 5 transferees for "Larger Apartments" who are medically needy may be certified "only" to the borough waiting

list through OCD. TSAP § VI(B) at 21; *see also* TSAP § VI(B) at 22–23 (applying the same limitation to Code 6 transferees who are elderly or are forced to commute more than 90 minutes).

to any preference by the applicant for a particular project in that borough, except where the applicant is assigned to a particular project as a part of the Applications Outreach Program, described below. TSAP § V(D)(2) at 15. In contrast, the TSAP explicitly allows transfer applicants for "Smaller Apartments" to choose any project designated as anticipating vacancies on the Interviewer's Guide as set forth by the TSAP in the section entitled "Tenant Transfers within Public Housing." TSAP at 18–23.

A tenant seeking a "Larger Apartment" therefore has but two options, to stay on a waiting list at his or her own project, or to apply for the borough-wide list for "Larger Apartments." Since the purpose of the borough-wide list for "Larger Apartments" is to bar requests for specific projects in order to accelerate movement of such apartments, to permit dual listing would in practical effect grant to the applicant the privilege of applying for Berry Street, using an existing priority for the present project, and if the request is certified to a different project, to decline and remain on, for example, the Independence Towers [20] list. There is no provision that the "dead" [21] exclusion, should it apply after two refusals, would extend to the pending project waiting list for "Larger Apartments." The effect is to provide a risk free application to the borough-wide list, yet it is the borough-wide list from which tenants for the "Larger Apartments" are to be certified. In short, if a tenant with high priority, perhaps arising from date of application, seeks a Larger Apartment, he or she may not select a project but will gain the first available "Larger Apartment" in the borough. To al-

low dual applications, not contemplated in the TSAP, would permit a *de facto* selection of Berry Street by transfer tenants living in the Williamsburg neighborhood.

The July 13 canvass, then, inappropriately informed recipients that transfer applicants for "Larger Apartments" could be placed on the borough-wide waiting list while concurrently remaining on their own project waiting list.[22] NYCHA also concedes that the dual list option for "Larger Apartment" would be "fairly easily cured" by recanvassing the 446 Larger Families who requested to be on two lists at the same time. Hearing Trans. at 67. Such recanvassing is required.

Thus, NYCHA may not under the language of the Consent Decree and TSAP allow transfer applicants the option of being on two lists at the same time. Those holding dual applications must elect which list they wish to be on—borough-wide or project specific.

## VI. *NYCHA Did Not Improperly "Hold Back" Berry Street*

While the timing of the canvassing coincided with the tenanting of Berry Street, the results of the canvass were needed to implement the TSAP. The certification for Berry Street was dependent on the result of the canvass and was thereafter properly delayed as a consequence of the pending motion. NYCHA did not improperly "hold back" the Berry Street project which presumably will be certified as soon as possible after the entry of an appropriate order based upon these conclusions.

> If it appears that the applicant may no longer be eligible for public housing or housing at that project, or if the applicant has been on the project "Waiting List" for more than two years and wishes to choose another project, or where there are "Changed Circumstances" under this Plan that may require reassignment to a new project, the project manager shall send the application to OCD which shall arrange a new eligibility interview and/or a new project choice, as required. When the applicant is reassigned to a new "Waiting List," the original date of certification shall control. TSAP at 25.

**20.** Independence Towers is one of the existing NYCHA developments in the Williamsburg area, the others are: Williamsburg Houses, Taylor–Wythe Houses and Jonathan Williams Plaza.

**21.** In these circumstances, a "dead" exclusion applies when an applicant or tenant refuses to "accept two apartment offers from the Command Center, OCD or the project to which the applicant has been certified, unless a temporary emergency prevents a move at the time of the second offer." TSAP § V(C) at 13; *see also id.* § V(D)(2) at 16.

**22.** Although NYCHA argues it is in compliance with page 25 of the TSAP, this practice is well beyond the cited language of the TSAP protocol:

## Conclusion

For the reasons set forth above, the Defendant's motion to clarify the terms of the Consent Decree to allow it to use transfer tenants is granted. The Plaintiffs' motion for preliminary injunctive relief is granted to prohibit the Defendant's use of dual lists for "Larger Apartments" in the tenanting of the Berry Street project. Settle order on notice.

It is so ordered.