Otto CRUMPTON; Freddie Crumpton; Jeanette Joyce; David Joyce; Martha Looney; Donna Looney; Lucille Lloyd; Renee Lloyd; Winifred Timberlake; Henry Timberlake; John S. Craig; Anthony Craig; June Rhodes; Jerry Rhodes; Minnie Bellew; Omah Harper; Keith Harper; Bettina Harper; Anthony Burchette; Blanche Burchette; Woodrow Taylor; Genith Taylor; Jane Bass; Felicia Bass; Roselyn Bass; Edith Kennedy; Karen Kennedy; Joanne Kennedy; Mona Kennedy; Edith Alvarado; Lydia Alvarado; Juan Alvarado; Pamela Alvarado; Naomi Alvarado; Erma Vargas; Wanda Vargas; Felix Vargas; Ricky Vargas; Antonio Vargas; Mario Vargas; Blanca Rios; Martin Rios; Daryl Slade; Marion White; Debbie Grace; Joey Sosa; James Hardy; Mildred Santana; Ricky Sosa; Juanda Rodriguez; National Association for Advancement of Colored People; Spanish American Development Association; Spanish American Coalition; Hall Neighborhood House; Beardsley Tenants' Association; Interdenominational Ministers Alliance; East End Neighborhood Council; Federation of Neighborhood Councils; Citywide Council on Education; Pace Parent Group; Herman Santana; Puerto Rican Youth Organization; Maria Andino; Alfred Andino, Jr.; Miguel Andino; Marilyn Andino; Antonio Andino; Earlene Bentley; Kelvin Bentley; Monalisa Bentley; Tangiela Bentley; Pauline Boone; Erik Boone; Clarice Brower; Cynthronia Mendes; Morris Morey; Myrna Castillo; Wilfredo Matos; Carolyn Matos; Aaliyah Salahuddin; Mustafa Salahuddin; Veda Salahuddin; Ricardo Santiago; Alina Santiago; Richard Santiago; Lucy Siberon; Gina Siberon; Gidgett Siberon, Plaintiffs–Appellees,

Walter C. Chop, Individually and in his capacity as Superintendent of Schools for the City of Bridgeport, the Bridgeport Board of Education; Howard Sinner; Anna B. Skane; Fleeta Hudson; Marietta Silvernail; Nancy Hornyak; Agnes Giannini; Michael Bisciglia; Victor Medina; Joel Kanter, Individually and in their capacity as officers and members of the Bridgeport Board of Education; John C. Mandanici, Jr., in his official capacity as Mayor of the City of Bridgeport; John G. Norko, in his official capacity as Comptroller of the City of Bridgeport; Louis Marcel; Edward Reich; Patricia Rayho; Sylvester Romano; William McMahon; Nicholas Mardozian; Carl Kleinknecht, in their official capacity as Members of the Board of Apportionment and Taxation of the City of Bridgeport; State Board of Education of Connecticut; Catherine V.A. Smith; Dayson D. Decorsey; M. Adele Eads; June K. Goodman; Rose K. Lubchansky; John E. Toffolon, Chairman; George L. West; Herbert Duke, Individually and in their capacity as members and officers of the Board of Education of the State of Connecticut; Mark R. Shedd, Individually and in his capacity as Commissioner of Education of the State of Connecticut, Defendants–Appellees,

v.

BRIDGEPORT EDUCATION ASSOCIATION, Intervenor–Defendant–Appellant.

No. 879, Docket 92–7763.

United States Court of Appeals, Second Circuit.

Argued March 15, 1993.

Decided May 17, 1993.

Robert H. Chanin, Washington, DC (Susan D. Carle, Jeremiah A. Collins, Bredhoff & Kaiser, Washington, DC, Martin A. Gould, Gould, Killian & Wynne, Hartford, CT., of counsel), for intervenor-appellant.

John O. Mirick, Worcester, MA (Charles B. Straus, Mirik, O'Connell, DeMallie & Lounge, of counsel), for defendants-appellees.

Before: ALTIMARI and WALKER, Circuit Judges, and MORRIS E. LASKER, Senior District Judge of the District Court for the Southern District of New York, sitting by designation.

ALTIMARI, Circuit Judge:

Intervenor–Appellant Bridgeport Education Association ("BEA") appeals from an order of the United States District Court for the District of Connecticut (Burns, J.) granting defendants' motion for "clarification" of a 1980 hiring order. The hiring order was intended to help implement a consent decree settling a 1975 class action suit brought by Black and Hispanic students attending public school in Bridgeport, Connecticut, who had sought to desegregate the Bridgeport school system. The 1979 consent decree was designed "to eliminate racial imbalance and to provide equality of educational opportunity in the Bridgeport public schools." In order to achieve more balance in the employment of teachers, the consent decree required a plan for an affirmative recruiting program. The 1980 hiring order provided for the preferential hiring of minority teachers. No provision was made, however, for layoffs in either the consent decree or the hiring order issued pursuant to the decree.

In the Spring of 1992, the City of Bridgeport sent layoff notices to 17 first-year white teachers. No notices were sent to minority teachers. The BEA filed a grievance, claiming that the absolute preference being given to minority teachers violated the reduction in force provision of the collective bargaining agreement to which both the City of Bridgeport and the BEA are parties. The defen-

dants representing the City of Bridgeport then made a motion before the district court to "clarify" the 1980 hiring order to make clear that Bridgeport should give an absolute preference to the retention of minority teachers in making reductions in force. In an order dated June 16, 1992, the district court granted the City defendants' motion.

On appeal, the BEA challenges the clarification, contending that the district court's order constitutes an impermissible modification of the consent decree and hiring order. The BEA also maintains that even if a modification was permissible, as modified the hiring order violates the Equal Protection Clause of the Fourteenth Amendment.

For the reasons set forth below, we vacate the district court's order and remand the case for proceedings in accordance with this opinion.

## BACKGROUND

In November of 1975, minority students attending school in Bridgeport, Connecticut, and their parents, filed suit seeking to have the school system desegregated. The defendants named in the complaint were the members of the Bridgeport Board of Education, the Bridgeport Superintendent of Schools, the Mayor of Bridgeport, the Comptroller of Bridgeport, and the members of the Bridgeport Board of Apportionment and Taxation, in their official and individual capacities (collectively "the City defendants"). Also named were the Connecticut State Commissioner of Education and the members of the Connecticut State Board of Education, also in their official and individual capacities (collectively "the State defendants").[1]

The matter was never litigated and instead all parties to the suit entered into a consent decree, which was approved by the District Court for the District of Connecticut (Burns, J.) on July 31, 1979. In the consent decree, the parties stipulated, *inter alia*, that:

> Various acts and omissions of the City Defendants prior to the filing of the com-

---

1. The State defendants took no position with respect to the motion, and have taken no position with respect to this appeal.

plaint when considered together and cumulatively resulted in racial segregation in and among some of the Bridgeport public schools in violation of the rights of the Plaintiffs and the classes which they represent under the Fourteenth Amendment to the United States Constitution. Such acts and omissions have had some impact on the entire school system.

The consent decree was designed "to eliminate substantial racial imbalance and to provide equality of educational opportunity in the Bridgeport public schools." In order to achieve more balance in the employment of teachers, the consent decree required the City defendants to file with the court a plan for an affirmative recruiting program.

The BEA was not a party to the consent decree. On July 31, 1979, the district court granted the BEA's motion to intervene as a defendant, but only "in the remedy phase of this litigation so far as it relates to the rights of members of the intervenors in the terms and conditions of employment."

On July 20, 1979, prior to the approval of the consent decree, the parties submitted a joint Stipulation of Facts to the district court. This document was designed to provide the district court with a concise statement of the facts relevant to many of the issues in the case and to the proposed consent decree. The Stipulation included statistics documenting the steady increase in the percentage of minority teachers as well as a significant downward trend in the total student population. Despite the fact that the Stipulation provided some indication that Bridgeport might eventually need to layoff teachers, given this declining enrollment, no provision was made for this eventuality in the consent decree.

Nor was any provision for layoffs included in the hiring program filed pursuant to the consent decree. The district court approved the plan, and on October 2, 1980, entered an Order On Hiring Minority Teachers and Administrators ("hiring order"), which among other things directed the City defendants:

to use their best efforts to recruit and hire minority teachers in such a manner that, on an annual basis, the total number of minority teachers hired shall at least equal the total number of white teachers hired, until the percentage of minority teachers in the Bridgeport Public Schools approximate the percentage of minority workers in the Bridgeport area labor force.

However, the hiring order made no mention of possible future reductions in force.

The hiring order was appealed by BEA to this Court, which in an unpublished opinion affirmed the challenged aspects of the hiring order while remanding for a clarification of the term "Bridgeport area labor force." *Crumpton v. Chop,* No. 80–9101 (2d Cir. November 23, 1981). On remand the district court held that the City defendants should use census data to define this term, and that the hiring order would terminate when the percentage of Black and Hispanic teachers equalled the percentage of Blacks and Hispanics in the Bridgeport work force.

While the BEA's appeal from the 1980 hiring order was pending, the City defendants were confronted by a budgetary problem for the 1981–82 school year. The City defendants submitted a report to the district court in which they proposed to layoff 32 non-tenured teachers in the same racial ratio as the teaching staff as a whole—that is, 75% of the layoffs would be of white teachers. This was in keeping with a provision for layoffs in the collective bargaining agreement between the BEA and the Bridgeport Board of Education. This provision provides, in pertinent part, that teachers would be laid off in reverse order of seniority, except that:

[t]hese procedures shall not operate with respect to any teacher where it would conflict with the Board's legal obligation to *preserve* affirmative action.

(emphasis added). These teachers were laid off and later recalled.

During the 1980s the percentage of minority teachers in the Bridgeport public schools rose steadily. However, the City defendants were unable to meet the ultimate goal set forth in the hiring order, and it remained in effect. In the Spring of 1990 and again in the Spring of 1991, the City defendants once again were forced to layoff teachers during the budgetary process. The BEA did not

challenge these layoffs, and the laid off teachers were ultimately rehired.

In the Spring of 1992, the City defendants sent layoff notices to 17 first-year white teachers. No notices were sent to minority teachers. This time the BEA filed a grievance, claiming that the absolute preference being given to minority teachers violated the reduction in force provision of the collective bargaining agreement. The City defendants then made a motion before the district court to "clarify" the hiring order to make clear that the City defendants should give an absolute preference to the retention of minority teachers in making reductions in force.

In an order dated June 16, 1992, the district court granted this motion "until such point as the percentage goal established by the [Hiring Order was] satisfied." In so doing, the district court held that *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), where the Supreme Court held that a layoff provision violated the Equal Protection Clause, was inapplicable. The court reasoned that whereas in *Wygant* the layoff provision was unrelated to any finding of discrimination on the part of the defendant school board, here the City defendants had conceded that they had previously engaged in racial discrimination. The district court also distinguished *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 574, 104 S.Ct. 2576, 2586, 81 L.Ed.2d 483 (1984), a Title VII case in which the Supreme Court invalidated a layoff provision not contemplated by a consent decree or by any arrangement between the union and the Fire Department, because the court concluded that the collective bargaining agreement between the Bridgeport Board of Education did contemplate the type of reduction that had occurred.

All of the teachers receiving layoff notices were subsequently rehired before the start of the 1992/93 school year. Nevertheless, the BEA now appeals to challenge the propriety of the district court's order.

## DISCUSSION

### I. *Jurisdiction*

On appeal, this Court must first determine whether we have appellate jurisdiction and subject matter jurisdiction. We conclude that we have both.

■ The BEA is correct in asserting that this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). If the district court has in fact modified the consent decree, then that modification would be in the nature of an injunction, prohibiting the City defendants from otherwise abiding by the layoff provisions contained in the collective bargaining agreement. *See Sansom Committee v. Lynn,* 735 F.2d 1552, 1553 (3d Cir.) (holding that modification of a consent decree took the form of an injunction and was an appealable order), *cert. denied,* 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 358 (1984). We therefore have jurisdiction to determine whether the district court's order constituted an impermissible modification of the consent decree. *Id.*

■ At oral argument the parties informed this Court that all of the laid-off teachers have been rehired. Therefore, we are also compelled to raise the issue of subject matter jurisdiction *sua sponte. See, e.g., Cable Television Association of New York v. Finneran,* 954 F.2d 91, 94 (2d Cir.1992).

Under Article III of the Constitution, this Court may ordinarily adjudicate "only actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). Under the "case or controversy" requirement it would not be sufficient that the dispute was very much alive when the City defendants filed their motion for "clarification" with the district court. *Id.* Because the laid-off teachers have all been rehired, the issue was raised at oral argument whether the BEA now lacks "a legally cognizable interest in the outcome" of this case. *New York City Employees' Retirement System v. Dole Food Company, Inc.,* 969 F.2d 1430, 1433 (2d Cir.1992) (citations omitted).

We note, however, that the relationship between the BEA and the City defendants continues to be governed by the hiring order at issue, and consequently conclude that the BEA has an enduring interest in the interpretation of this document. *See Stotts,* 467

U.S. at 568–70, 104 S.Ct. at 2582–83 (holding that case not moot because the modification of the consent decree continued to have an impact on the parties). Furthermore, even if there were no such continuing interest on the part of the BEA, this case would unquestionably satisfy the "capable of repetition, yet evading review" exception to the actual case and controversy requirement. *See Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam). In light of the fact that there have been a series of three layoffs in the 1990s, there is undoubtedly a reasonable expectation that the membership of the BEA will be subject to future reductions in force, and that the BEA will oppose the absolute preference given to minority teachers. In addition, because the layoffs thus far have only been for a short duration, it is likely that the matter could not be litigated before laid-off teachers are recalled. We can, therefore, reach the merits of this case. *Id.*

## II. *The Clarification*

■ On appeal, the BEA initially argues that the clarification of the hiring order constituted an impermissible modification of the consent decree. In addressing this contention two questions must be asked: (1) whether the clarification was in fact a modification; and, if so, (2) whether the changed circumstances necessitating the modification were anticipated at the time the hiring order was entered into, thereby precluding the modification. This Court answers the first question in the affirmative, and, therefore, vacates and remands the case to the district court so that it can answer the latter question in the first instance.

### A. *Modification*

■ While a consent decree is a judicial pronouncement, it is principally an agreement between the parties and as such should be construed like a contract. *See, e.g., Securities and Exchange Commission v. Levine*, 881 F.2d 1165, 1178 (2d Cir.1989). Traditional contract principles apply, including the principle that documents incorporated by reference, such as the hiring order at issue here, become an intrinsic part of the contract. *Id.* at 1179. Furthermore, like a contract, the scope of a consent decree "must be discerned within its four corners," *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), and, hence, a court construing such a document is "not entitled to expand or contract the agreement of the parties as set forth in the consent decree." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985).

Our conclusion that the district court's clarification was in reality a modification of the consent decree is mandated by *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). In *Stotts* a Title VII action had been settled by use of a consent decree, the stated purpose of which was to remedy the fire departments' hiring and promotion practices with respect to blacks. The consent decree at issue in *Stotts* dealt only with hiring procedures and did not mention what procedures would be used if layoffs were necessary. Subsequently, the fire department announced that a budgetary crisis required it to reduce the size of its force. The district court then issued an injunction, enjoining the fire department from following the seniority system in its collective bargaining agreement in making the required layoffs. The Sixth Circuit affirmed, finding that the injunction did no more than to enforce the consent decree or alternatively was necessary and appropriate to effectuate the purposes of the decree. *See id.* at 573–74, 104 S.Ct. at 2585–86.

The Supreme Court reversed. According to the Court,

> the "scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it" or by what "might have been written had the plaintiff established his factual claims and legal theories in litigation."

*Id.* at 574, 104 S.Ct. at 2585 (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971)). The preferential layoff plan, which the injunction sought to effectuate, was deemed a modification of the consent decree because "there [was] no mention of layoffs ... within the four corners of the decree;

nor was there any suggestion of an intention to depart from the existing seniority system or from the City's arrangements with the Union." *Id.*

The City defendants attempt to distinguish *Stotts* on two grounds, both of which are equally unavailing. The City defendants first note that *Stotts* involved a consent decree settling a Title VII case, whereas here the consent decree settled a desegregation case. According to the City defendants, a court has much broader discretion to fashion a remedy where a constitutional violation is being corrected than it does in a Title VII case. However, in the instant case there was never a judicial finding that a constitutional violation had occurred precisely because a consent decree resolved the parties' dispute. A carefully worded consent decree can not substitute for a judicial determination. *See, e.g.,* 18 Charles A. Wright et al., Federal Practice & Procedure § 4443 (1981). While a finding of past discrimination is not necessary for the imposition of remedial measures, *see Wygant,* 476 U.S. at 286, 106 S.Ct. at 1853 (O'Connor, *J.,* concurring), such a finding is necessary where a party to a consent decree implementing such measures resists a proposed change in the decree. Consequently, we are not surprised that the City defendants can provide no precedent for the proposition that, in determining whether a consent decree has been modified, school desegregation decrees should be analyzed differently from decrees entered in Title VII cases. *Stotts'* instruction that courts should look to the four corners of the consent decree is equally applicable to either setting, and applies both to the consent decree and the hiring order incorporated into the decree by reference. *See, e.g., Levine,* 881 F.2d at 1178.

The City defendants also argue that *Stotts* is distinguishable because the collective bargaining agreement at issue in *Stotts* did not contemplate reductions in force, whereas in the instant suit the agreement contains a provision stating that the seniority procedures would not operate when they conflicted "with the Board's legal obligation to *preserve* affirmative action." (emphasis added). The district court relied on this distinction in

issuing its order. It is, however, a distinction without a difference.

It certainly is not clear from the face of this provision in the collective bargaining agreement that it contemplates the layoff of only white teachers. The district court failed to make any findings concerning the meaning or purpose of this provision, which predated the consent decree and hiring order. In any event, the "clarification," by allowing Bridgeport to layoff only white teachers, unquestionably does more than *preserve* the affirmative action gains made; rather it allows Bridgeport to *increase* these gains. *Stotts* can reasonably be read to require that a court look to the four corners of a consent decree unless a provision in the collective bargaining agreement clearly provides for the change in the status quo that is being sought. *See Stotts,* 467 U.S. at 573–75, 104 S.Ct. at 2585–86. Because the provision in the collective bargaining agreement does not unquestionably sanction this change, we hold that the district court's "clarification" was in reality a modification of the consent decree. *Id.*

**B.  *Was the Modification Impermissible?***

Having found that the district court modified the consent decree, the next question is whether the modification was permissible.

According to the recent teachings of the Supreme Court in *Rufo v. Inmates of Suffolk County Jail,* — U.S. —, — – —, 112 S.Ct. 748, 760–61, 116 L.Ed.2d 867 (1992),

> [A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance.
>
> \*     \*     \*     \*     \*     \*

Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree. If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless

agreed to the decree, that party would have to satisfy a heavy burden ...

In the instant case BEA argues that it was readily apparent from the statistics that were provided to the court by the parties that a reduction in force would soon be necessary because of declining enrollments. Indeed, Bridgeport instituted a layoff shortly after the hiring order was signed. Nevertheless, whether the changing circumstances were anticipated at the time the decree was entered into is a question of fact that should be decided by the district court in the first instance.

Finally, we reject the City defendants' contention that *Rufo* stands for the proposition that a modification occurs only when a party requests to be relieved of some obligation imposed upon it by the terms of the consent decree. *See id.* —— U.S. at ——, 112 S.Ct. at 761. Clearly one party to a consent decree cannot unilaterally rewrite the agreement over another party's objections, in order to pursue a course of action favored by it but detrimental to the opposing party, where the course of action is not authorized by the consent decree. *See Stotts,* 467 U.S. at 575–76, 104 S.Ct. at 2586 (holding that the acceptance of an additional obligation resulted in the modification of a consent decree).

### III. *Equal Protection*

■ Although we need not reach the BEA's argument that the consent decree as modified violates the Equal Protection Clause of the Fourteenth Amendment, given our resolution of the previous matters on appeal, we shall address this contention in the interests of judicial economy, because we find that it has merit. Accordingly, even if the district court finds that the hiring order can be modified, it must craft a modification that is more narrowly tailored than the modification at issue here.

Notwithstanding the district court's contrary conclusion, the teachings of *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) unquestionably apply here. Like *Wygant,* "[t]his case presents the question whether a school board, consistent with the Equal Protection Clause, may extend preferential pro-

tection against layoffs to some of its employees because of their race or national origin." *Id.* at 269–70, 106 S.Ct. at 1844–45. While a district court may have more latitude in remedying violations of the Constitution than in remedying violations of Title VII, such license could conceivably be granted only where a district court has found that a local board of education "employed staff hiring practices that contribute to a racially segregated school system." *Arthur v. Nyquist,* 712 F.2d 816, 822 (2d Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3555, 82 L.Ed.2d 856 (1984). The consent decree preempted such a finding here, and consequently *Wygant* applies with full force.

■ *Wygant* mandates a two pronged analysis: (1) the racial classification "must be justified by a compelling governmental interest"; and (2) the means chosen to effectuate this purpose must be "narrowly tailored to the achievement of that goal." 476 U.S. at 274, 106 S.Ct. at 1847 (citations omitted).

■ Rectifying past discrimination is unquestionably a compelling governmental interest. However, *Wygant* instructs that before embarking on a course of action, there must be "sufficient evidence to justify the conclusion that there has been prior discrimination," and where the remedial program is challenged in court by non-minority employees "the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary." *Id.* at 277, 106 S.Ct. at 1848. In the instant appeal the entire remedial program set into place by the consent decree is not being challenged, as the BEA is contesting only the layoff procedures recently sanctioned by the district court. Before approving a challenged layoff scheme, the district court must determine that the City defendants had a strong basis for concluding that its staff hiring practices contributed to a racially segregated school system. *See Nyquist,* 712 F.2d at 822.

Even if the district court makes such a finding, it is evident that the means chosen to rectify this prior discrimination are not "narrowly tailored" to the achievement of this goal. The layoff plan in the present case

grants an absolute preference to minority teachers. It goes far beyond the proportional plan invalidated in *Wygant*. The plurality in *Wygant* differentiated hiring goals from layoffs no matter how temporary. 476 U.S. at 282–83, 106 S.Ct. at 1851–52. "Denial of a future employment opportunity is not as intrusive as loss of an existing job." *Id.* at 283, 106 S.Ct. at 1851. The Court invalidated a proportional layoff plan as not sufficiently narrowly tailored. *Id.*

In this case, white teachers may have expected the layoffs to be proportional given their collective bargaining agreement, which speaks in terms of preserving the gains made. Consequently, if a proportional layoff scheme had been implemented here, it could have passed muster under *Wygant*. Indeed, a proportional layoff scheme may be necessary here in order to safeguard the progress made in Bridgeport toward desegregation. *See Nyquist*, 712 F.2d at 823 (upholding proportional layoff); *Morgan v. O'Bryant*, 671 F.2d 23, 28 (1st Cir.), *cert. denied*, 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982) (same).

No court, however, has held that a layoff procedure giving absolute preference to minorities is narrowly tailored to achieve the goal of rectifying past injustices of any form. As the *Morgan* court noted, no plan should "unnecessarily trammel the interests or opportunities of whites." 671 F.2d at 28. By sanctioning the dismissal of only white employees, the district court's order needlessly subverts the reasonable interests of white teachers. Sanctioning the exclusive layoffs of one race, in an effort to rectify past injustices, is an impermissible means to a legitimate end.

### CONCLUSION

For the foregoing reasons, the district court's order "clarifying" the consent decree and accompanying hiring order is vacated. On remand the district court shall first determine whether modification of the hiring order is permissible because the parties did not anticipate the possibility of future reductions in force. If the court concludes that a modification would be permissible, it must then determine whether defendants had a strong

basis for concluding that staff hiring practices had contributed to a racially segregated school system. Only after making such a determination, may the district court craft a more narrowly tailored remedy consistent with this opinion.