John QUERIM, Plaintiff,

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Spencer H. Lewis, individually and in his private capacity as District Director of the Equal Employment Opportunity Commission, New York Newspaper Printing Pressmen's Union # 2, Edward Fleming, individually and in his official capacity as President of the New York Newspaper Printing Pressmen's Union # 2, the New York Times Company, John O'Brien, individually and in his corporate capacity as Deputy General Manager of the New York Times Company, Defendants.

No. 97 Civ. 4031(RPP).

United States District Court,
S.D. New York.

March 6, 2000.

John Querim, New York City, pro se.

Proskauer Rose LLP, by Fredric C. Leffler, Lloyd B. Chinn, New York City, for Defendants the Times and O'Brien.

Skadden, Arps, Slate, Meagher & Flom LLP, by Lawrence A. Marcus, Carl G. Guida, New York City, for Defendants the Union and Edward Fleming.

EEOC Office of Legal Counsel, by Jeffrey T. Rosen, Washington, DC, for Defendant the EEOC.

Mary Jo White, United States Attorney, Southern District of New York, for Defendant Lewis.

## OPINION AND ORDER

PATTERSON, District Judge.

All defendants move to dismiss the First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motions are granted as to all eight counts of the First Amended Complaint.

### Background

The following facts are alleged in plaintiff's First Amended Complaint, dated August 22, 1997.

Plaintiff John Querim ("Querim") has been employed by the New York Times Company (the "Times") as a casual non-union pressman since 1992 and was, at the time of the First Amended Complaint, listed on the Times' casual seniority hiring list. (First Am. Compl. ¶ 2.) On or around April 3, 1995, the Equal Employment Opportunity Commission ("EEOC") and the Times and the New York Newspaper Printing Pressmen's Union # 2 (the "Union") entered into a Title VII Consent Decree (the "Decree").

The Decree sets out an Affirmative Action Program to be implemented by the Times and the Union, the aims of which are:

> to achieve a goal of twenty-five percent (25%) minority and female representation on the Casual List and a goal of

twenty-five percent (25%) minority and female representation among the Junior Pressmen, certified by the Joint Apprenticeship Committee and offered membership in the Pressmen's Union, in the Times Co. bargaining unit represented by the Pressmen's Union.

(First Am. Compl., Ex. 3, ¶ 12(a).)

The Decree describes a delisting procedure, by which those persons on the Casual List who did not shape at least one shift between January 1, 1994 and June 30, 1994 are removed from the Casual List, with some exceptions. (First Am. Compl., Ex. 3, ¶ 11(a)-(b).) During the effective period of the Decree, persons on the Casual List are required to shape a minimum of forty-four shifts during each calendar year, with some exceptions. (First Am. Compl., Ex. 3, ¶ 11(c)-(d).)

The Affirmative Action Program includes a reformulation of the Casual List after the delisting: the Casual List is to start with the two most senior non-minority males, followed by the two most senior females or minority males, followed by the three next most senior non-minority males, followed by the next two most senior females or minority males, with the 3/2 reordering continuing until the list is exhausted. (First Am. Compl., Ex. 3, ¶ 13(a).) The Decree requires each female or minority male to sign and deliver to the Times a Release within sixty days of the entry of the Decree as a condition of having his/her position on the Casual List adjusted. (First Am. Compl., Ex. 3, ¶ 13(b).) Additional procedures are described in the Decree, to be implemented if the delisting and reformulation procedures do not result in at least 25% female and/or minority representation on the Casual List. (First Am. Compl., Ex. 3, ¶ 14(a).)

In or around July 1995, plaintiff's seniority was adversely affected by having at least ten minorities and females with less experience and seniority than plaintiff be placed above him on the Casual List. (First Am. Compl. ¶ 34.) Some eligible females and minorities declined to sign the Release required by ¶ 13(b) of the Decree within the designated time and, therefore, did not benefit from the reformulation of the Casual List in July 1995. (First Am. Compl. ¶ 35.) One of the stated goals of the Decree, 25% female and/or minority representation on the Casual List, was achieved before September 1996. (First Am. Compl. ¶ 36.)

An Agreement and Order was entered on September 3, 1996, by which the parties to the Decree agreed to an additional period during which eligible females and minorities could elect to sign the Release and have his/her placement on the Casual List adjusted as if he/she had signed the Release during the time originally proscribed by the Decree. (First Am. Compl., Ex. 4, Agreement and Order at 2–4.) The Agreement and Order explained that this opportunity was being given because: 1) "certain [eligible] females and minority males ... did not exercise their right to have their placement on the Casual List adjusted"; 2) "certain of those females and minority males now seek to sign the Release ... and to have their placement on the Casual List adjusted"; 3) a charge had been filed with the EEOC that the Decree was retaliatory under Section 704(a) of Title VII "insofar as it results in a failure to adjust the Casual List placement of minorities who did not exercise their rights" under the Decree; and 4) "the parties desire, in order to effectuate the purposes of the Consent Decree, to provide a further opportunity for females and minority males to have their placement on the Casual List adjusted pursuant to the Consent Decree." (First Am. Compl., Ex. 4, Agreement and Order at 1–2.)

Because of the second reformulation pursuant to the Agreement and Order, plaintiff's position on the Casual List was again "pushed back" on or around December 26, 1996. (First Am. Compl. ¶ 38.)

Plaintiff's First Amended Complaint contains a total of eight counts against six defendants. First, he complains of breach

of the collective bargaining contract, in violation of 28 U.S.C. § 185, against the Times and the Union. (First Am. Compl. ¶ 43–51.) Second, he complains of breach of the duty of fair representation, in violation of 29 U.S.C. § 185, by the Union. (First Am. Compl. ¶ 52–54.) The Third Count of the First Amended Complaint alleges deprivation of the right to contract, in violation of 42 U.S.C. § 1981, by the Times and the Union. (First Am. Compl. ¶ 55–57.) The Fourth Count alleges Title VII employment discrimination by the Times, the Union, Edward Fleming ("Fleming"), President of the Union, and John O'Brien ("O'Brien"), Deputy General Manager of the Times. (First Am. Compl. ¶ 58–65.) Fifth, plaintiff complains of conspiracy by the Times, the Union, Fleming, and O'Brien to deprive plaintiff of his constitutional right to make and enjoy contracts and substantive and procedural due process, in violation of 42 U.S.C. § 1985(3), 42 U.S.C. § 1981, and the Fifth Amendment. (First Am. Compl. ¶ 66–69.) The Sixth Count alleges violation of 42 U.S.C. § 1986 by the Times, the Union, Fleming, and O'Brien. (First Am. Compl. ¶ 70–74.) The Seventh Count is against the EEOC, for going beyond its statutory and constitutional authority, in violation of the Administrative Procedures Act ("APA") and the Fifth Amendment. (First Am. Compl. ¶ 75–80.) Finally, the Eighth Count of the First Amended Complaint is a *Bivens* claim against Spencer H. Lewis ("Lewis"), the District Director of the New York Division of the EEOC, for violation of plaintiff equal protection and substantive and procedural due process rights under the Fifth Amendment. (First Am. Compl. ¶ 81–88.)

All defendants filed motions on January 27, 1998. Defendants O'Brien and the Times filed a motion to dismiss or, in the alternative, for summary judgment. The Union filed a motion to dismiss the First and Second Counts of the First Amended Complaint. Defendant EEOC filed a motion to dismiss. Finally, defendant Lewis filed a motion to substitute the United States as a party, to dismiss the First Amended Complaint or, in the alternative, for summary judgment, and for a stay of discovery. The Court will consider only defendants' motions to dismiss, not their motions for summary judgment, because discovery has not been completed in this case.

**Discussion**

I. *Standard for Motion to Dismiss*

When ruling on a motion for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. *See Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). The complaint may only be dismissed where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The latter principle is to be applied with "particular strictness" when the plaintiff complains of a civil rights violation. *See, e.g., Dwyer v. Regan*, 777 F.2d 825, 829 (2d Cir.1985); *Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir.1979); *Escalera v. New York City Housing Authority*, 425 F.2d 853, 857 (2d Cir.1970). In evaluating the adequacy of pleadings on a motion to dismiss, the pleadings in a pro se complaint are held to a "less stringent standard than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). In addition, a pro se complaint is to be liberally read when it implicates vindication of civil rights or civil liberty. *Nilsson v. Coughlin*, 670 F.Supp. 1186, 1188 (S.D.N.Y.1987).

II. *Motion to Dismiss of the Times and O'Brien*

Defendants the Times and O'Brien move to dismiss Counts 1, 3, 4, 5 and 6 of the First Amended Complaint. The Union joins in their motion as to Counts 3, 4, 5, and 6. They argue, among other things,

that plaintiff's First Amended Complaint constitutes a collateral attack on the Decree in violation of Title VII. (Def.'s Times and O'Brien's Mem. in Supp. of Mot. to Dismiss at 10.)

### A. *The Law on Collateral Attacks on Title VII Consent Decrees*

Before 1989, most circuits, including the Second Circuit, precluded collateral attacks on Title VII consent decrees. *See, e.g., Marino v. Ortiz*, 806 F.2d 1144, 1146 (2d Cir.1986) (stating that "[i]t is well settled that collateral attacks on consent decrees entered in Title VII actions are not permitted"). The circuit courts reasoned:
> (i) that the effectiveness of such decrees as a mechanism to settle claims short of or early in the litigation process would be substantially undermined, if not eliminated, if the decrees were subject to perpetual challenge; and (ii) that such decrees have played a beneficial role in providing relief to thousands of victims of systemic employment discrimination.

*Edwards v. City of Houston*, 37 F.3d 1097, 1120 (5th Cir.1994) (dissenting opinion).

In 1989, in *Martin v. Wilks*, the Supreme Court allowed white firefighters who alleged that they had been denied promotions because of employment decisions made pursuant to Title VII consent decrees to challenge those employment decisions. 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). In making its decision, the Court stated:
> "[i]t is a principle of general application in Anglo–American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." This rule is part of our "deep-rooted historic tradition that everyone

should have his own day in court." A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.

490 U.S. at 761–62, 109 S.Ct. 2180 (internal citations omitted).

In enacting Section 108 of the Civil Rights Act in 1991,[1] Congress attempted to reconcile the Supreme Court's ruling in *Martin v. Wilks* with the rationale of the circuits that had prohibited collateral attacks on consent decrees prior to *Martin v. Wilks*. In other words, Congress aimed to "balance the rights of non-litigants against the need for finality of judgments and prompt relief for discrimination." H.R.Rep. No. 40(I), 102d Cong. (1991), reprinted in 137 Cong. Rec. 588 (1991), U.S.C.C.A.N.1991, 588. The House Committee on Education and Labor explained the need for the legislative ban on collateral attacks on consent decrees:
> In sum, the Committee finds that legislation is needed to established reasonable procedures for prompt and orderly resolution of challenges to consent decrees. Such legislation must ensure that nonparties who may be adversely affected by a court decree resolving such a case have an adequate opportunity to challenge the decree. But interested persons should normally have their 'day in court' prior to, rather than subsequent to, the entry of a consent decree.

Id. at 592.

Section 108 of the Civil Rights Act reads, in relevant part:
> (1)(A)Notwithstanding any other provision of law, and except as provided in paragraph (2),[2] an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employ-

---

1. This section of the Civil Rights Act is codified at 42 U.S.C. § 2000e–2(n).

2. Subparagraph (2) states:
   (2) Nothing in this subsection shall be construed to–
      (A) alter the standards for intervention under rule 24 of the Federal Rules of

Civil Procedure or apply to the rights of parties who have successfully intervened pursuant to such rule in the proceeding in which the parties intervened;
(B) apply to the rights of parties to the action in which a litigated or consent judgment or order was entered, or of members of a class represented or sought

ment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).

> (B) A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal Civil Rights laws
>> (i) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had–
>> (I) actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and
>> (II) a reasonable opportunity to present objections to such judgment or order; or
>> (ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

42 U.S.C. § 2000e–2(n)(2).

B. *Application of Section 108 of the Civil Rights Act to Plaintiff's Claims*

To determine whether Counts 1, 3, 4, 5, and 6 of the First Amended Complaint

to be represented in such action, or of members of a group on whose behalf relied was sought in such action by the Federal Government;
(C) prevent challenges to a litigated or consent judgment or order on the ground that such judgment or order was obtained through collusion or fraud, or is transparently invalid or was entered by a court lacking subject matter jurisdiction; or
(D) authorize or permit the denial to any person of the due process of law required by the Constitution.

42 U.S.C. § 2000e–2(n)(2). None of the circumstances addressed in this subparagraph are applicable to plaintiff's claims. The issue

constitute a collateral attack on the Decree, the Court will look at 1) whether the "employment practice" about which plaintiff complains is "within the scope" of the Decree, and 2) whether plaintiff had notice and an opportunity to be heard with respect to the amendment of the Decree by the Agreement and Order.

### 1. The Second Reformulation of the Casual List Was Within the Scope of the Decree

Plaintiff's claims concern the second reformulation of the Casual List pursuant to the September 3, 1996 Agreement and Order, whereby plaintiff's position on the Casual List was "adversely pushed back on or around December 26, 1996." (First Am. Compl. ¶ 38.) Whether the second reformulation was within the scope of the Decree depends on whether the Amendment and Order was a modification of the Decree, for which a new hearing would be necessary, or simply an amendment.

In *Rufo v. Inmates of Suffolk County Jail*,[3] the Supreme Court held that "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." 502 U.S. 367, 383, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). In addition, as articulated by the Fourth Circuit in *Johnson v. Robinson*:

> To modify a consent decree to impose new obligations, a district court must at

of denial of due process, referred to in 42 U.S.C. § 2000e–2(n)(2)(D), is addressed *infra*, in the discussion about the adequacy of plaintiff's notice and hearing with respect to the Decree.

3. The consent decree at issue in *Rufo* was not entered pursuant to Title VII, but the Court's decision in that case has been applied to Title VII consent decrees. *See, e.g., Allen v. Alabama State Board of Education*, 164 F.3d 1347 (11th Cir.1999); *Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*, 13 F.3d 33 (2d Cir.1993); *United States v. City of Chicago*, 978 F.2d 325 (7th Cir.1992).

a minimum (1) provide specific notice that it is contemplating the imposition of obligations in addition to those contained in the decree; (2) allow the parties an opportunity to present relevant evidence on the need for the additional obligations and the proper character of those obligations; and (3) issue specific findings that support a determination that modification is warranted.

987 F.2d 1043, 1050 (4th Cir.1993) (citing *United States v. Western Electric Co.,* 894 F.2d 430, 437 n. 12 (D.C.Cir.1990)).

■ Plaintiff cites the Second Circuit case, *Crumpton v. Bridgeport Education Association,* in support of his argument that the Agreement and Order constitutes a modification of the Decree. That case concerned a consent decree designed "to eliminate racial imbalance and to provide equality of educational opportunity in the Bridgeport public schools," and a hiring order issued to implement the consent decree, which "provided for the preferential hiring of minority teachers." 993 F.2d 1023, 1025 (2d Cir.1993). Neither the consent decree nor the hiring order made provision for layoffs. Defendants "made a motion before the district court to 'clarify' the hiring order to make clear that the City defendants should give an absolute preference to the retention of minority teachers in making reductions in force," which motion was granted by order of the district court. 993 F.2d at 1027. On appeal by the Bridgeport Education Association of the order granting this motion, the Second Circuit held that the order constituted a modification of the consent decree. In making its decision, the court relied on the Supreme Court decision in *Firefighters Local Union No. 1784 v. Stotts,* in which case the Court held, on similar facts, that "[t]he preferential layoff plan ... was deemed a modification of the consent decree because 'there [was] no mention of layoffs ... within the four corners of the decree; nor [was] there any suggestion of an intention to depart from the existing seniority system.'" 993 F.2d at 1028–29

(quoting *Stotts,* 467 U.S. 561, 574, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984)).

To determine whether the Agreement and Order was a modification or an amendment to the Decree, it is instructive to look at relevant provisions of the Decree and the effect of the Agreement and Order on the goals and procedures of the Decree.

The Decree is to remain in effect until April 5, 2005. (First Am. Compl., Ex. 3, ¶ 9(a).) The Decree gives this Court jurisdiction "for purposes of enforcing [the Decree's] provisions and for the purpose of enabling any of the parties to apply to the Court for such further orders and directions as may be necessary or appropriate to effectuate the provisions of this Decree." (First Am. Compl., Ex. 3, ¶ 10.) The Decree describes an Affirmative Action Program, designed "to achieve a goal of twenty-five percent (25%) minority and female representation on the Casual List and a goal of twenty-five percent (25%) minority and female representation among the Junior Pressmen, certified by the Joint Apprenticeship Committee and offered membership in the Pressmen's Union, in the Times Co. bargaining unit represented by the Pressmen's Union." (First Am. Compl., Ex. 3, ¶ 12(a).)

The Agreement and Order provides for "an additional period during which eligible females and minority males on the Casual List ... may elect to sign a Release," and orders that "the placement on the Casual List of each Eligible Casual who timely elects to sign and deliver a Release ... will be adjusted ... in the same manner as if the Eligible Casual has signed and delivered the Release to the Employer within sixty (60) days following entry of the Consent Decree." (First Am. Compl., Ex. 4, ¶¶ 2, 4.)

In essence, the Agreement and Order amends the sixty-day deadline for signing a Release. This amendment has retroactive effect on the reformulation of the Casual List, but does not change any other provisions of the Decree. In contrast to the modification of the consent decree in

*Crumpton,* the Agreement and Order makes a minor adjustment to a procedure described in the Decree, but its intention and effect are wholly contemplated "within the four corners" of the Decree. *Crumpton,* 993 F.2d 1023, 1029 (2d Cir.1993). It does not declare any new goals, nor suggest any new means to achieving the goals set forth in the Decree.

Plaintiff argues in his First Amended Complaint that, "[t]hough fully aware that the 25% minority quota for the casual hiring list had been attained, [defendants] willfully, knowingly and with reckless disregard to Plaintiff agreed to a second seniority override." (First Am. Compl. ¶ 37.) However, had all eligible females and minorities signed the Release within the original period, they would have had their positions on the Casual List readjusted in the first reformulation of the list even if this readjustment would have resulted in more than 25% female and minority representation on the Casual List. The Decree does not set 25% female and minority representation on the Casual List as a ceiling for the reformulation but specifies that the reformulation should continue until the list is exhausted. Therefore, defendants' actions in connection with the Amendment and Order were consistent with the Decree and cannot be characterized as showing "reckless disregard to Plaintiff." (First Am. Compl. ¶ 37.)

The Agreement and Order was not a modification of the Decree but an amendment to it. Therefore, the second reformulation of the Casual List, done pursuant to the Agreement and Order, was "within the scope" of the Decree.

### 2. Plaintiff Had Notice and a Hearing Regarding the Decree

■ Because the second reformulation of the Casual List was within the scope of the Decree, plaintiff is estopped from filing claims based on this second reformulation if he had "actual notice" of the Decree and "an opportunity ... to present objections" to the entry of the Decree. 42 U.S.C. § 2000e–2(n)(1)(B)(i)(I).

Plaintiff does not assert that he was denied notice and a hearing with respect to the entry of the Decree. Instead, the First Amended Complaint alleges that he was not given notice and a hearing on the Agreement and Order. As discussed above, the Agreement and Order amended, but did not modify, the Decree. Therefore, plaintiff's notice and opportunity to be heard regarding the Decree was sufficient as to the Agreement and Order as well.

When plaintiff received notice of the Decree and was heard on the issue, he could not predict with certainty how many eligible females and minority males would take advantage of the reformulation of the Casual List. He was aware when he was heard on the Decree that all eligible females and minorities might sign the Release. Therefore, he had notice that the implementation of the procedures described in the Decree might result in his position on the Casual List being pushed back to where it was after the second reformulation, and he had an opportunity to be heard on this potential adverse effect on his status on the Casual List.

Plaintiff was additionally affected by the Agreement and Order only in that his adverse repositioning on the Casual List occurred in two stages, instead of all at once. Plaintiff's position on the Casual List was pushed back first in July 1995 and then again in December 1996. (First Am. Compl. ¶¶ 34, 38.) Had the entire reformulation occurred at one time, plaintiff would have known the extent of the adverse effect of the reformulation on his seniority in July 1995, after the first reformulation of the Casual List.

This harm, namely the occurrence of his repositioning on the Casual List in two stages, is not sufficient to require notice and a hearing with respect to the Agreement and Order. Plaintiff knew that the Decree was in effect until 2005 and that the terms of the Decree may affect him at some point in the future, for example if the

female and minority representation on the Casual List dropped below 25%. He had notice that his position on the Casual List was subject to the terms of the Decree until April 2005. Therefore, because plaintiff had notice and a hearing as to the Decree and because his position on the Casual List was not affected beyond the extent contemplated in the Decree, plaintiff is estopped from making a collateral attack on the Decree, as amended by the Agreement and Order.

■ There is "no set of facts in support of [plaintiff's claims in Counts 1, 3, 4, 5, and 6 of the First Amended Complaint] which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Therefore, defendants' motion to dismiss is granted as to Counts 1, 3, 4, 5, and 6 as against all defendants.

### III. *Motions of Other Defendants*

#### A. *The Union's Motion to Dismiss*

■ The only remaining claim against the Union is the Second Count of the First Amended Complaint, breach of the duty of fair representation. Plaintiff argues that, "by endorsing the second seniority override that was based on race/sex [the Union] breached, in bad faith, its duty of fair representation to Plaintiff by discriminating against him on that impermissible basis." (First Am. Compl. ¶ 53.) The Union argues that this claim should be dismissed both because the Union does not owe the plaintiff, who is not a member of the Union, a duty of fair representation and because the Union did not breach its duty of fair representation by endorsing the Agreement and Order. (Def. Union's Mem. in Supp. of Mot. to Dismiss at 13–14.)

The Court need not reach the issue of whether the Union owes plaintiff a duty of fair representation, because plaintiff has alleged no facts which could constitute a breach of that duty on the part of the Union. The Second Count of the First Amended Complaint is based on the Un-

ion's actions in connection with the Agreement and Order. These actions cannot constitute a breach of the duty of fair representation in that the Union acted to implement the Decree. As such, the Second Count of the First Amended Complaint must be dismissed because it constitutes a collateral attack on a consent decree in violation of Title VII.

It is worth noting that plaintiff had notice that the Decree would take precedence over the collective bargaining agreement, because the Decree states that:

> In the event of a conflict between this Decree and any provision(s) of the collective bargaining agreement between Times Co. and the Pressmen's Union (the "Agreement"), this Decree shall govern. Accordingly, no arbitral award under the Agreement may prevent or interfere with the effectuation of any provision of this Decree.

(First Am. Compl., Ex. 3, ¶ 26(a)).

#### B. *The EEOC's Motion to Dismiss*

Defendant EEOC argues that plaintiff's claim against it should be dismissed because plaintiff has failed to state a cognizable claim against it under Title VII, the Fifth Amendment, or the APA. (EEOC's Mem. in Supp. of Mot. to Dismiss at 3.) In his First Amended Complaint, plaintiff asserts that:

> though fully aware that there was no racial imbalance in the hiring list and that the 25% minority quota had been reached, the EEOC committed to a final agency action via its legal brief in support of the September 3, 1996 Order that encouraged race balancing and was beyond the EEOC's authority under Title VII and in violation of its own regulations 29 C.F.R. 1608.4(2)(i) that calls for race/sex conscious provisions to be maintained only as long as necessary to reach determined objectives.

(First Am. Compl. ¶ 76.) Plaintiff also contends that "the EEOC urged that no notice be afforded to adversely affected employees like Plaintiff of the second se-

niority override endorsed by the September 3, 1996 Order." (First Am. Compl. ¶ 77.) The Seventh Count of the First Amended Complaint alleges that the EEOC went beyond its statutory and constitutional authority, in violation of the APA and the Fifth Amendment.

The "legal brief" to which plaintiff refers was submitted by the EEOC in support of entry of this Agreement and Order. In the brief, the EEOC argued that the proposed amendment to the Decree, embodied in the Agreement and Order, did not modify the Decree in that its purpose was to "effectuate the purpose of the decree" and did not require a fairness hearing because "[t]he proposed amendment would only do what was contemplated at the time of the [first] fairness hearing," conducted on October 28, 1994. (First Am. Compl., Ex. 4, EEOC Brief.) In support of its argument that a second fairness hearing was not required, the EEOC explained:

> Absent the confusion over the waiver, females and minority males would have had their positions adjusted on the "Casual List." The amendment's only purpose is to correct the confusion caused by the waiver. The effect of the amendment on third parties has already been the subject of a fairness hearing. The amendment only permits an event that was known and that could have been objected to at the time of the hearing. Therefore no individuals' rights are affected in any manner other than what was anticipated when objections to the decree were heard.

(First Am. Compl., Ex. 4, EEOC Brief at 9.)

### 1. Violation of the APA

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA explains that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

The "agency action" for which plaintiff invokes the APA is the EEOC's legal brief in support of the Agreement and Order and arguing that a new hearing was not required for the amendment. To be entitled to judicial review under the APA, plaintiff must show 1) that he has suffered a "legal wrong" because of "agency action" or that he has been "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, and 2) that the agency action is "reviewable by statute" or "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Plaintiff's claim against the EEOC under the APA fails because he has not proven either the first or the second requirement.

First, plaintiff has not shown that he has been adversely affected by the EEOC's legal brief in support of the Agreement and Order. As discussed above, no hearing was required before entry of the Agreement and Order, because it did not modify the Decree. Therefore, plaintiff cannot prove that he suffered an adverse effect from the EEOC arguing in its brief that a hearing was not required.

Second, plaintiff has not shown that the APA applies to the EEOC's action. No statute expressly makes actions of the EEOC reviewable. *See Hall v. EEOC*, 456 F.Supp. 695, 700 (N.D.Ca.1978.) Therefore, for judicial review to be proper, the EEOC's legal brief must constitute a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Plaintiff argues that the EEOC's action, its legal brief, is reviewable because "the brief is not unlike the EEOC promulgating a regulation that is contrary to Plaintiff's right to have notice prior to the Decree's entry, and Plaintiff's right to be free of race balancing under Title VII." (P.'s Mem. in Opp. to EEOC's Mot. to Dismiss at 20.) The EEOC wrote its brief in the role of advocate, based on the specif-

ic facts surrounding the enforcement of the Decree. It cannot be construed as a regulation or as "final agency action" of any kind.

Plaintiff's claim against the EEOC under the APA fails as a matter of law because he has not met the APA's requirements for judicial review of an agency action.

### 2. Fifth Amendment

■ Plaintiff also argues that the EEOC's legal brief violated his rights under the due process clause and the equal protection clause of the Fifth Amendment. Specifically, he argues "that the EEOC denied him Due Process right to notice by urging that no notice be afforded Plaintiff prior to the entry of the order." (P.'s Mem. in Opp. to EEOC's Mot. to Dismiss at 18.) Plaintiff's due process claim against the EEOC is not cognizable. The Supreme Court has held that, generally, the due process clause applies "when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals" but not "when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted." *Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). Applying the reasoning of *Hannah v. Larche*, courts in this district have held that the due process clause does not apply to "investigative and nonadjudicatory" actions by the EEOC. *Sauls v. EEOC*, 1979 WL 113, at 4 (S.D.N.Y., Nov. 9, 1979(MJL)); *see also Shaw v. Frank*, 1989 WL 146794 (S.D.N.Y., Nov. 30, 1989(LBS)). The EEOC's action of writing a legal brief in support of the Agreement and Order is "nonadjudicatory" and does not "directly affect the legal rights" of plaintiff. Therefore, the due process clause is not applicable.

■ Plaintiff's equal protection claim is based on his contention that "[t]he EEOC . . . urged a new race/gender ratio be effected [which] went beyond a remedial effort to an invidious governmental race/gender classification that could not be justified under strict scrutiny of the Equal Protection clause." (P.'s Mem. in Opp. to EEOC's Mot. to Dismiss at 19.) Plaintiff mischaracterizes both the nature of the EEOC's legal brief and the nature of the Agreement and Order. The Agreement and Order did not effect a new race/gender ratio, but simply provided another opportunity for eligible persons to take advantage of the provisions of the Decree. The EEOC's legal brief supported this second opportunity.

Plaintiff has presented no facts which would entitle· him to relief as to the Seventh Count of the First Amended Complaint. Therefore, plaintiff's claim against the EEOC is dismissed.

### C. *Lewis' Motion to Dismiss*

■ The Eighth Count of the First Amended Complaint is a *Bivens* claim against Lewis, for violation of the equal protection and due process clauses of the Fifth Amendment. Lewis is the District Director of the New York Division of the EEOC. (First Am. Compl. ¶ 4.) Defendant Lewis argues that the claim against him should be dismissed because "the amended complaint . . . fails to allege any facts regarding Lewis's personal involvement in any action allegedly taken against the plaintiff and thus fails to state a claim against Lewis." (Def. Lewis's Mem. in Supp. of Mot. to Dismiss at 7.)

Plaintiff asserts that the officers and employees of the EEOC violated his equal protection rights "by failing to show and not being able to justify why the race/gender second seniority override was required to further a governmental interest and why it remained a narrowly tailored remedy." (First Am. Compl. ¶ 84.) Plaintiff attributes this equal protection violation to Lewis, arguing that, "[b]y failing to properly train and supervise and control those EEOC employees and officers who committed to a final agency action by urging that race balancing and no notice or a

hearing be afforded to white males like Plaintiff ..., Defendant Lewis exhibited gross negligence and deliberate indifference to Plaintiff and waived any immunity he might have enjoyed." (First Am. Compl. ¶ 85.)

To make out a *Bivens* claim, the plaintiff must "allege the defendant's direct and personal responsibility for the purportedly unlawful conduct of his subordinates." *Black v. United States*, 534 F.2d 524, 527 (2d Cir.1976). The doctrine of respondeat superior is not sufficient to hold a supervisor liable under *Bivens.*

In *Barbera v. Smith,* the Second Circuit held that plaintiff had failed to make out a *Bivens* claim against the former United States Attorney for supervisor liability where:

> the complaint merely alleges in conclusory language that he negligently and recklessly failed to train and supervise [an employee] adequately ... [The complaint does not allege] that [he] created or acquiesced in a policy or practice of poor training and supervision of subordinate Assistant United States Attorneys. Nor does the complaint plead any other facts sufficient to support an inference that [the United States Attorney] was reckless in managing his subordinates.

*Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987). Plaintiff's First Amended Complaint is similarly devoid of specific allegations against Lewis.

Because plaintiff has not met the standard for a *Bivens* claim against Lewis, the Eighth Count of the First Amended Complaint is dismissed.

Conclusion

Counts 1, 2, 3, 4, 5, and 6 of the First Amended Complaint are dismissed because they constitute collateral attacks on the actions of the Union, Fleming, the Times and O'Brien in connection with the Decree in violation of 42 U.S.C. § 2000e-2(n)(1). The Seventh Count is dismissed because plaintiff has failed to make out a claim

against the EEOC under either the APA or the Fifth Amendment. The Eighth Count is dismissed because no facts support plaintiff's *Bivens* claim against Lewis. Finally, because the underlying facts and circumstances upon which plaintiff relies cannot be a proper subject of relief, plaintiff's request to amend the Complaint is denied.